37611, 37612. McDANIEL et al. v. THOMAS et al.; and vice versa.

SMITH, Justice

The basic question presented by this case is whether the current system of funding public education in Georgia conforms to the mandates of our state constitution.

Plaintiff-appellees are parents, children and school officials who reside in school districts which, in relation to other school districts in the state, have a low property tax base.[1] They brought a declaratory judgment action in the Superior Court of Polk County alleging that the existing system of financing public education 1) violates the equal

---

[1] The original complaint in this case was filed on December 20, 1974. The plaintiffs consisted of school children by and through their parents, property taxpayers and members of the Whitfield County School Board. All plaintiffs were residents of Whitfield County. On September 27, 1979, a motion to intervene as plaintiffs was filed by a property owners association, property taxpayers and school children, all of Lowndes County. This was followed by similar motions by county school boards and children of Carroll and Polk counties. The motions were granted by consent order.

protection provisions of our state constitution (Constitution of 1976, Art. I, Sec. II, Par. III (Code Ann. § 2-203); Art. I, Sec. II, Par. VII (Code Ann. § 2-207)) and 2) deprives the children in their district of an "adequate education" in contravention of Art. VIII, Sec. I, Par. I (Code Ann. § 2-4901) and Art. VIII, Sec. VIII, Par. I (Code Ann. § 2-5601). The trial court agreed with plaintiffs' equal protection arguments and declared the existing school finance system unconstitutional. Defendants brought this appeal.[2] The court, however, rejected plaintiffs' assertions regarding "adequate education," and they have filed a cross-appeal.

## I.  *Justiciability*

Appellants contend that there is a "threshold issue" which, when properly resolved, must result in a dismissal of the case without consideration of the merits. They argue that "the question of how public education can best be funded is nonjusticiable" and is "more suitably handled by other branches of government."

Such an argument, in our view, misperceives the nature of this dispute. Neither the trial court nor this court has been called upon to decide whether, as a policy matter, a particular financing scheme is "better" than another. We have been asked to determine whether the existing method of financing public education in this state meets constitutional requirements. Judicial review of legislative enactments is central to our system of constitutional government and deeply rooted in our history (Marbury v. Madison, 5 U. S. (1 Cranch) 137, 176 (1803)). A substantial number of courts have been called upon to decide issues similar to those presented in this case and have not found the difficulties associated therewith to be insurmountable. See, e.g., Northshore School District No. 417 v. Kinnear, 84 Wash. 2d 685 (530 P2d 178) (1974); Shofstall v. Hollins. 110 Ariz. 88 (515 P2d 590) (1973). Indeed, "[w]e know of no sister State which has refused merits treatment to such issues, and we would regard our own refusal to adjudicate plaintiffs' claim of constitutional infringement an abdication of our constitutional duties. We turn, then, to the merits of the action." Board of Education, Levittown v. Nyquist, —— N. Y. S2d —— (Case Decided October 26, 1981) (Slip Opinion, p. 20).

## II.  *The Georgia Public School Financing System.*

Public education in Georgia is financed through federal, state and local funds. In the decade of the 1970's, the relationship between

---

[2] The original defendants were those public officials who, at the time suit was filed, comprised the State Board of Education as well as the State Superintendent of Schools and the Attorney General of Georgia. In the course of this litigation, various substitutions and dismissals of parties have occurred. No issue relating to parties has been raised.

these sources was as follows:

| | 1970-71 | | 1974-75 | | 1977-78 | |
|---|---|---|---|---|---|---|
| | Amount (in millions) | Percentage | Amount | Percentage | Amount | Percentage |
| Local | 151 | 23.9 | 260 | 27.9 | 358 | 27.5 |
| State | 367 | 58.0 | 516 | 55.3 | 719 | 55.3 |
| Federal | 115 | 18.1 | 157 | 16.3 | 224 | 17.2 |
| Total | 633 | 100.0 | 933 | 100.0 | 1301 | 100.0 |

Most federal funds for public education are earmarked for specified purposes and may be termed "categorical" grants. (See, e.g., Education for All Handicapped Children Act, 20 USC § 1401 et seq.) As the state's control over these funds is limited, they are not a basic part of the *state* financing system. When federal funding is removed, the above table can be recomputed as follows:

| | 1970-71 | | 1974-75 | | 1977-78 | |
|---|---|---|---|---|---|---|
| | Amount (in millions) | Percentage | Amount | Percentage | Amount | Percentage |
| Local | 151 | 29.2 | 260 | 33.5 | 358 | 33.2 |
| State | 367 | 70.8 | 516 | 66.5 | 719 | 66.8 |
| Total | 518 | 100.0 | 776 | 100.0 | 1077 | 100.0 |

Some state funding is also "categorical" and is frequently distributed in conjunction with federal programs. Programs for superintendents' salaries, teacher retirement, compensatory education, staff development, school lunches, assistance to the handicapped and cooperative educational service agencies fall under this general heading.

The great bulk of state support for local school systems, approximately 80 per cent, is allocated under the Adequate Program for Education in Georgia (APEG). See Code Ann. Chapter 32-6A. In fiscal year 1981, APEG was funded at a level of almost $800 million.

APEG sets forth thirteen items for cost calculation purposes: (1) salaries of special education teachers, (2) salaries of pre-school (i.e. kindergarten) teachers, (3) salaries of classroom teachers and vocational education teachers, (4) purchase of instructional media, (5) purchase and repair of instructional equipment, (6) maintenance and operation expenses, (7) payment of sick and personal leave expenses, (8) travel expenses of personnel, (9) student services support personnel salaries, (10) salaries of administrative and supervisory personnel, (11) salaries of clerical personnel, (12) pupil transportation expenses, and (13) expenses of maintaining isolated schools. The APEG items, of course, are not funded equally — over half of APEG funding is for Item 3 alone.[3]

APEG is designed to meet basic educational needs. Because the basic needs of school districts vary, the amounts allocated

---

[3] It appears that a few APEG items are not currently funded or only partially funded. See Ga. L. 1980, pp. 1799, 1840; Code Ann. §§ 32-612a; 32-624a.

to a particular school district within a particular APEG item also vary. Most allotments are based upon the number of pupils in the district in average daily attendance.[4] See, e.g. Code Ann. §§ 32-605a, 610a. Others, such as transportation, take other factors into account. See Code Ann. § 32-625a. None of the parties to this litigation challenge the propriety of the APEG classifications.

APEG is not simply a grant from the state to local school districts. As a condition to participation in APEG, each local school district must contribute an amount obtained from ad valorem taxation. This amount is referred to as "required local effort" (RLE). Each school district's RLE is calculated on the basis of its proportionate share of the equalized adjusted school property tax digest[5] multiplied by a total statewide local effort figure of 78.6 million.[6] Because the RLE is determined on the basis of a school district's proportionate share of property wealth, the property tax rate imposed by each school district for RLE is virtually the same, approximately 2.15 mills. (A one mill rate imposes a tax of 1/10 cent on each dollar's worth of property.)

After a district's RLE is determined, it is deducted from the total amount to which the district is entitled under APEG. The remainder is provided by the state. With the total statewide RLE fixed at $78.6 million, APEG is currently funded 90% by state funds and 10% by RLE.

Theoretically, RLE is an equalizing component in the APEG

---

[4] The term "average daily attendance" refers to the average number of students in attendance in the school district. Because of student absences throughout the school year, the number of students in ADA should be slightly less than the number actually enrolled.

[5] Because local tax assessors in Georgia do not all assess property at the same percentage of fair market value, the State conducts an assessment sales ratio study to compensate for differing assessment practices among taxing jurisdictions. Through this study the State auditor determines for each school district and independent city district the percentage of full market value at which local property is assessed. Using this percentage — which is called the assessment sales ratio — each district's total tax digest can be adjusted to 100% value or any other value. These adjustments to a common percentage of full market value must be made to accurately compare tax digests among school systems. In order to make valid comparisons of tax rates, it is necessary to focus on the "effective" tax rate. As used in this opinion, "effective mills" means the tax rate that would have to be applied to raise a given amount of revenue if the property were actually assessed at 40% of market value, the standard used for county assessment.

[6] Ga. L. 1974, pp. 1045, 1072 called for "a statewide required local effort of at least $78,500,000 but no more than $78,600,000." The permissible range for total RLE has remained unchanged since 1974. See Code Ann. § 32-629a.

system — the state provides less funds to school districts which, by virtue of local property values, are more capable of financing public education at the local level. Suppose there were two school districts in the state, each with 1,000 students in ADA. If District A with $100,000 in assessed valuation per student in ADA had twice the assessed valuation of District B (which thus has $50,000 in assessed valuation per student in ADA), District A would have an RLE of $1,000 per student in ADA and District B would have an RLE of $500 per student in ADA, if both districts imposed an RLE ad valorem tax of 10 mills. If both districts had an APEG cost of $1,000 per student in ADA, District A would receive no funds from the state, while District B would receive $500 per student in ADA from state APEG funds.

In reality, however, RLE does little to equalize property rich and property poor districts. As indicated above, the total statewide RLE has been fixed at approximately $78.6 million. Meanwhile, educational costs have risen. Whereas, in the early 1970's, total RLE constituted almost 20 percent of APEG, it now amounts to only 10 percent. Total RLE is at such a low level, relative to total APEG expenditures, that it cannot have a significant equalizing effect as between property rich and property poor districts. Thus, to an extent, APEG has become a flat grant from the state to local districts wherein considerations relating to local wealth have no place.

If APEG were the only source of public school funding in this state, there would be no significant disparities between school districts insofar as revenues per student in ADA is concerned. However, APEG is not the only source of school revenues. In addition to the categorical aid referred to above, all 187 local school districts in Georgia supplement APEG with funds derived from local property tax assessments. See Constitution of 1976, Art. VIII, Sec. V, Par VI (Code Ann. § 2-5306); Art. VIII, Sec. VII, Par. I (Code Ann. § 2-5501)); Art. VIII, Sec. VII, Par. II (Code Ann. § 2-5502); see also Code Ann. § 32-656a. It is this feature of the Georgia public school finance system which is largely responsible for the present action.

The amount of local supplement per student in ADA available to a particular school district is dependent upon that district's property tax base. If District A, with $100,000 property tax base per student in ADA were to impose a 10 mill property tax above RLE, it would have $1,000 available per pupil in local supplement. If District B, with a $50,000 property tax base per student in ADA, were to impose the same tax, it would only obtain $500 per pupil in local supplement.

The following table illustrates the effect of disparate assessed

valuations per student in ADA for 1977-78:[7]

| | *AV Per Student In ADA | Effective Local Supp. Mills | State APEG Per Student In ADA | APEG Incl. RLE Per Student In ADA | Local Supp. Funds Per Student In ADA | Total APEG & Local Supp. Per Student In ADA |
|---|---|---|---|---|---|---|
| Decile 1 | $68970 | 7.59 | $609 | $814 | $481 | $1295 |
| Decile 2 | 45472 | 7.67 | 617 | 794 | 349 | 1143 |
| Decile 3 | 39563 | 8.84 | 605 | 793 | 349 | 1142 |
| Decile 4 | 37693 | 8.28 | 625 | 757 | 311 | 1068 |
| Decile 5 | 34605 | 8.04 | 634 | 798 | 277 | 1075 |
| Decile 6 | 31543 | 8.06 | 619 | 776 | 253 | 1029 |
| Decile 7 | 29382 | 8.67 | 629 | 815 | 254 | 1069 |
| Decile 8 | 27671 | 7.82 | 615 | 772 | 215 | 987 |
| Decile 9 | 25219 | 9.75 | 622 | 775 | 246 | 1021 |
| Decile 10 | 21896 | 9.21 | 642 | 795 | 200 | 995 |

*Assessed Valuation

From this table, the following can be observed: 1) in terms of total APEG and local supplemental funding, a disparity of $300 per student in ADA exists between students in the top decile and those in the lowest decile;[8] 2)these disparities would be even greater if school districts in the lower deciles did not impose higher effective millage rates for local supplement than school districts in higher deciles; 3) regardless of decile, the lion's share of funds available through APEG and local supplements comes from APEG alone — 62.8 per cent in Decile 1 and 79.9 per cent in Decile 10; and 4) local supplements, and not APEG, are responsible for existing disparities in educational expenditures.

The evidence in this case establishes beyond doubt that there is a direct relationship between a district's level of funding and the educational opportunities which a school district is able to provide its children. Due to differences in funding, instructional staffs in low wealth districts tend to have less formal training and experience than those in wealthy districts. Larger salary supplements and employee

---

[7] In using "deciles," the school districts in the state have been placed in ten groups according to relative wealth. Decile 1 is comprised of the school districts which rank in the upper 10 percent of the state in terms of assessed valuation·per·student in ADA. Decile 10 is the lowest 10 percent.

[8] Because the above table is broken into deciles, the most extreme disparities in assessed valuation per student in ADA are not shown. They can, however, be seen in the following table:

Assessed valuation per student in ADA
(1977-78)

| | |
|---|---|
| High: Heard County | $138,115 |
| Dalton Independent (Decile 1) | 77,640 |
| State Average | 35,135 |
| Whitfield County (Decile 10) | 20,972 |
| Low: Carroll County | 17,537 |

This table demonstrates that the wealthiest district, Heard County, was 7.9 times wealthier than the poorest system, Carroll County. In 1977-78, the highest spending district spent $1,682 per student in ADA, while the lowest spending district spent $777.

benefits provide wealthier districts with a substantial competitive edge. Furthermore, wealthy school districts are financially capable of hiring more teachers than poor districts and thus have a lower student-teacher ratio.

The curriculum in high wealth districts is also superior to that of low wealth districts. The evidence in record establishes that, in low wealth districts, opportunities are limited (or in some cases non-existent) in such areas as foreign language, higher mathematics and science, art, music, physical education, vocational education, special education and remedial education.

Disparities in funding also affect the availability of textbooks, library books, audio-visual equipment, supplies, counseling and testing services, and extra-curricular activities as well as the condition of school buildings and grounds.

The effect of major disparities between school districts is compounded when, as is sometimes the case, poor and wealthy school districts are in close proximity to one another. The superintendent of low wealth Whitfield County testified as follows: "We are compared with [neighboring] Dalton constantly and because of the tremendous difference in financial resources available we come out 'second-class.' This has a devastating impact on our children—educationally, psychologically and otherwise."

Based on the foregoing, the following conclusion of the trial court is unassailable: "[S]imilarly situated children receive very different amounts of educational resources as a result of disparities among school districts in taxable property wealth per pupil. . . The inequalities in the school finance system deny students in property poor districts equal educational opportunities."

### III. *The Ruling Below*

Faced with the above factual setting, the trial court reasoned as follows with respect to appellees' equal protection claim:

1) The "equal protection" provisions of the Georgia Constitution (Code Ann. §§ 2-203, 2-207), though employing different phraseology than the 14th Amendment, "are substantially equivalent of equal protection of the laws under the U. S. Constitution." See *State of Ga. v. Sanks,* 225 Ga. 88 (166 SE2d 19) (1969).

2) "There are three standards generally accepted for determining constitutionality under the Equal Protection Provisions of both the U. S. and State Constitutions: (1) The rational relationship test; (2) The intermediate level of scrutiny; and (3) The strict judicial scrutiny standard. Under the rational relationship test a statutory classification is presumed valid and will comport with constitutional standards as long as it bears a *reasonable* relationship

to a legitimate governmental purpose. The intermediate level of judicial scrutiny requires that a classification be *substantially* related to an *important* governmental objective. See, *Craig v. Boren,* 429 U. S. 190 (1976). Under the strict judicial scrutiny standard, which is employed when a classification involves socially stigmatic inequalities, such as those based on race . . . the governmental classification will fall unless the government demonstrates that the classification is *necessarily* related to a *compelling* governmental objective. See, *San Antonio School District v. Rodriguez,* 411 U. S. 1 (1973); *Graham v. Richardson,* 403 U. S. 365 (1971); *Shapiro v. Thompson,* 394 U. S. 618 (1969); *Mosgrove v. Town of Federal Heights,* 190 Colo. 1, 543 P. 2d 715 (1975); *Bernzen v. Boulder,* 186 Colo. 81, 525 P. 2d 416 (1974); *Jarmel v. Putnam,* 179 Colo. 215, 499 P. 2d 603 (1972). Application of the strict scrutiny test means that the classification is not entitled to the usual presumption of validity and that the State bears the burden of proving that the classification system 'has been structured with "precision" and is "tailored" narrowly to serve legitimate objectives and that it has selected the less "drastic means" for effectuating its objectives.' *San Antonio School District v. Rodriguez, supra* at 16-17."

3) APEG "creates great disparity in the expenditures per child among school districts . . . School children in the poor districts are discriminated against because they happen to live in a district with no industrial development or with less valuable property within the district."[9]

4) "If the right to a public education is a fundamental right in Georgia, then the Strict Standard must be applied . . . and unless the defendants could show some paramount or compelling governmental interest necessarily related to the infringement on the rights of the plaintiffs, the defective laws must be declared unconstitutional."

5) Art. VIII, Sec. I, Par. I of the Constitution of 1976 (Code Ann. § 2-4901) provides: "The provision of an adequate education for the citizens shall be a *primary obligation* of the State of Georgia, the expense of which shall be provided for by taxation." Under Art. VIII, Sec. VII, Par. I (Code Ann. § 2-5601), "[t]he General Assembly shall by taxation provide for an adequate education for the citizens of Georgia." Education is a "fundamental" right.

6) "Assuming that the State has a valid and compelling interest in maintaining local decision making power, the present taxing and allocation system is not necessary to further this interest . . . The

---

[9] As we indicated above, APEG is not responsible for disparities between districts. Local supplements create them.

options open to poor school districts now are certainly limited as they cannot freely choose to tax themselves into an equality with the districts having a larger tax base."

7) "The paramount governmental interest sought to be shown by the State in this case is not shown to be necessarily or substantially related to the maintaining of the current system's inequality and would fall under any [equal protection standard]."

8) Art. VIII, Sec. VII, Par. I (Code Ann. § 2-5501) and Art. VIII, Sec. VIII, Par. I (Code Ann. § 2-5601) do not constitute constitutional authority for the existing public school finance system in Georgia. "While it is true that some required local effort is set out in the Constitution, this Court finds that all Constitutional Provisions can be given effect and that, with all Constitutional Provisions involved, an unequal and unfair taxing system as shown here, is not dictated by the terms of the Constitution." If Code Ann. § 2-5501 "required an exact millage to be levied by each school system, then the defendant's constitutional argument might be valid. However, since it is not, APEG or any other system must equalize the funding as between school districts and also the taxing methods as between taxpayers."

Although the trial court found appellees' equal protection claim meritorious, it rejected their "inadequacy of educational opportunity" claim, holding that "[u]nder the Constitutional Provision [stating] 'an adequate education for the citizens shall be a primary obligation of the State,' the quantum of education provided would be almost exclusively for the General Assembly to determine and certainly there is no indication of an abdication of that responsibility in this case."

With respect to possible solutions to existing inequities in public school funding, the court stated it "has no doubt that the Legislature and the executive department will respond to the need to devise a new system of funding, recognizing that the citizens will support adequate education but that under the Constitution it must be potentially equal, though not perfect . . . The solution . . . is undoubtedly political and the Court will leave it so."

## IV.  *The Cross-Appeal*

To clarify the issues, we shall deal with the cross-appeal first. Cross-appellants maintain that the trial court erred in finding that the existing systems of funding public education in Georgia does not violate Code Ann. §§ 2-4901 and 2-5601. They present two distinct arguments: 1) that the term "adequate education" as embodied in the constitution "incorporates equal educational opportunity as a basic concept;" and 2) that public education in some school districts is so deficient in basic areas of study that it fails to meet the "adequacy" standard mandated by the state constitution.

1. In addressing the merits of cross-appellants assertion the term "adequate education" "incorporates equal educational opportunity as a basic concept," it is necessary to have some understanding of the history of public education in Georgia prior to the ratification of the Constitution of 1945, wherein the "adequate education" language first appears.[10] This history, it can be seen, is largely a chronicle of the quest for permanent and adequate financing for public education.

More important, for purposes of the instant case, is what this history reveals as to the circumstances existing when the education provision of the 1945 Constitution was formulated. It is clear that, between 1943 and 1945, significant inequalities between local school districts persisted. Moreover, these inequalities were the product of disparities in property values between school districts. Existing legislation helped minimize funding disparities arising from differences in local wealth, but by no means did it eliminate them.

The adoption of the term "adequate education" was not intended to fundamentally alter the existing obligation of the state with regard to education. Mr. Frank Gross, a member of the Constitutional Revision Commission, explained the purpose of the new language to the rest of the Commission: "We tried to make a broader definition of the general purpose of education and eliminated some of the language we thought was surplusage." Records of Constitutional Commission, Vol. I, p. 276. Although consolidation of local school districts as well as a statewide educational tax were discussed (Id., Vol. I, pp. 296, 302), the Commission decided that existing independent school districts should not be abolished. Mr. J. I. Allman expressed the following view: "[W]henever you abolish the average independent system in the larger community you lower the standard of the schools, because the county as a whole, together with what the State puts in the school system, cannot maintain all of the schools in the county on the level that the independent system now operates, and that is my reason for not having advocated its abolition. There is a philosophy on the other side." Id., Vol. I, pp. 306-307. The Constitutions of 1945 and 1976 preserve the independent school districts. See Code Ann. §§ 2-5306 and 2-5307; see also Code Ann. § 32-1111.

With regard to county systems, Commission Chairman Ellis Arnall stated: "It is my insistence, a fair county board of commissioners would provide adequate funds for the school, and if they did not the people would soon force them out of office." Id., Vol.

---

[10] See Appendix: A History of Public Education In Georgia.

I, p. 312. Mr. Gross expressed the same sentiment: "Now whether it is a wise thing to give to the tax levying authorities of the counties, I don't know, but I don't believe you will ever go wrong in giving this amount of power to somebody who has to go to the people in order to get back in office. I don't believe anybody ever went wrong in submitting a matter to the people, and as to whether or not you could get a county commissioner or ordinary in office, that would be contrary to the education program, I think all we have to do is analyze the power of education in the State of Georgia. I don't think anyone of you that ever offered yourself for election would stop to think that you could be elected did you not have those who were interested in schools to support you. It is so interwoven, and I believe any elected official who has the power to levy these taxes will certainly do his part by the schools if he ever expects to keep office, and if he does not do it, I think the people will certainly voluntarily retire him at the next election. As for me, I think it is all right to leave it to the tax authorities." Id., Vol. I, pp. 312-313.

The constitution proposed by the Commission provided the following: "The fiscal authority of the several counties shall levy a tax for the support and maintenance of education not less than five mills nor greater than fifteen mills (as recommended by the County Board of Education) upon the dollar of all taxable property in the County located outside independent school systems, and the provisions of this section shall apply to the public school systems referred to in Section X [i.e. independent school districts]." Id., Vol II, p. 607.

The framers of the 1945 Constitution envisioned a scheme under which the financing of county and independent school districts was largely based on ad valorem taxation within the district. They understood that disparities in wealth between districts existed and prohibited the formation of new independent school districts. They declined, however, to downgrade existing independent systems by mandating consolidation with county school systems. They acknowledged the "equalization fund" set up by the legislature, but did not give it constitutional status. Id., Vol. I, p. 323.

In 1962, Art. VIII, Sec. XIII, Par. II of the 1945 Constitution (former Code Ann. § 2-7503) was ratified by the voters of this state. It provides: "Freedom from compulsory association at all levels of public education shall be preserved inviolate. The General Assembly shall by taxation provide funds for an adequate education for the citizens of Georgia."[11] The new provision, while expressly recognizing the obligation of the General Assembly "to provide funds for an adequate education" did not purport to impose an obligation on the

---

[11] This provision is now Art. VII, Sec. VIII, Par. I of the Constitution of 1976.

legislature to *equalize* educational opportunities.

The Constitution of 1976 preserves the same basic financing structure as the 1945 Constitution (as amended). The requirement of local funding for education through ad valorem taxation is maintained. Code Ann. § 2-5501 provides: "The fiscal authority of each county shall annually levy a school tax for the support and maintenance of education, not greater than twenty mills per dollar as certified to it by the county board of education, upon the assessed value of all taxable property within the county located outside any independent school system or area school district therein. The independent school system of Chatham County and the City of Savannah being co-extensive with said county, the levy of said tax shall be on all property in said county as recommended by the governing body of said system. The certification to be made by an Area Board of Education to the fiscal authorities of the territories comprising an area school district shall be in such amount and within such limits as may be prescribed by local law applicable thereto, and upon such certification being made it shall be the duty of such fiscal authorities to levy such tax in accordance with such certification, but such levy shall not be greater than twenty mills per dollar upon the assessed value of the taxable property therein. School tax funds shall be expended only for the support and maintenance of public schools, public education, and activities necessary or incidental thereto, including school lunch purposes. The twenty mill limitation provided for herein shall not apply to those counties now authorized to levy a school tax in excess thereof." Under Code Ann. § 2-5502, "the twenty mill limitation . . . may be removed or increased in a county or in territories comprising an area school district" by local election.

The Georgia constitution thus contains very specific provisions relating to the obligation of localities to impose a tax for the maintenance of the public schools and general provisions imposing a duty on the state and General Assembly to provide its citizens an "adequate education." Nowhere in Article VIII of the Constitution is there any express statement as to the obligation of the state to equalize educational opportunities.

In view of the foregoing, we must conclude that the "adequate education" provisions of the constitution do not restrict local school districts from doing what they can to improve educational opportunities within the district, nor do they require the state to equalize educational opportunities between districts. See Olsen v. State, 276 Or. 9 (554 P2d 139) (1976); Thompson v. Engelking, 96 Idaho 793, 798 (537 P2d 635) (1975); Milliken v. Green, 390 Mich. 389 (212 NW2d 711) (1973); Shofstall v. Hollins, supra. Cf. Robinson v.

Cahill, 62 N. J. 473 (303 A2d 273) (1973).

2. Having determined that the term "adequate education" does not "incorporate equal educational opportunity as a basic concept," we must decide whether public education in some school districts is so deficient in basic areas of study that it fails to meet the "adequacy" standards of the state constitution.

The term "adequate education" is not defined in our constitution. Moreover, Georgia appears to be the only state in the union which employs such a phrase in its constitution to delineate the state's basic obligation with respect to education. See Pauley v. Kelly, 255 SE2d 859, 863-874, 884-886 (W. Va. 1979). However, it is clear that even a "minimum" education must "provide each child with an opportunity to acquire the basic minimum skills necessary for the enjoyment of the rights of speech and of full participation in the political process." San Antonio School District v. Rodriguez, supra at 37.

Beyond this minimum, then, lies an "adequate" education. However, this court has recently noted the inherent difficulty in establishing a "judicially manageable standard for determining whether or not pupils are being provided 'an adequate education.'" Deriso v. Cooper, 246 Ga. 540, 543 (272 SE2d 274) (1980). We deal in an area where courts have "traditionally deferred to state legislatures." San Antonio School District v. Rodriguez, supra at 40. Thus, while an "adequate" education must be designed to produce individuals who can function in society, it is primarily the legislative branch of government which must give content to the term "adequate."

As noted by the trial court, there has been no legislative disregard of the constitutional command that the state provide an adequate education for its citizens. The state's financial commitment to public education is massive — currently in excess of one billion dollars per year, approximately $800 million of which is allocated under APEG. In the absence of evidence to show that existing state funding for public education deprives students in any particular school district of basic educational opportunities, cross-appellants' contention that low wealth districts fail to provide an "adequate education" must be rejected. "To do otherwise would be an unwise and unwarranted entry into the controversial area of public school financing, whereby this Court would convene as a 'super-legislature', legislating in a turbulent field of social, economic and political policy." Thompson v. Engelking, supra at 798.

For the above reasons, the judgment on the cross-appeal is affirmed.

## V. *The Main Appeal*

The issue presented in the main appeal is whether the trial court

erred in holding that the current system of financing public education in Georgia violates the equal protection provisions of the state constitution. It is conceded that any challenge to the Georgia system under the equal protection clause of the U. S. Constitution is foreclosed by San Antonio School District v. Rodriguez, supra.[12]

As a general proposition it is beyond dispute that the equal protection provisions of the Georgia Constitution set forth "general constitutional requirements governing all legislation . . ." Serrano v. Priest, 18 Cal. 3d 728, 773 (135 Cal. Rptr. 345) (1977). However, in the instant case, we deal in an area where the Constitution itself sets forth specific state and local obligations with regard to education. This court has construed the "adequate education" provisions of the Georgia Constitution as requiring the state to provide basic educational opportunities to its citizens, and we have found that the existing public school finance system meets constitutional requirements in this regard. The question now presented is whether the state equal protection provisions impose an *additional* obligation on the state to *equalize* educational opportunities.

What is disturbing about finding such an obligation under state equal protection is the fact that an entire article of the Georgia Constitution (Article VIII) is specifically devoted to education. That article mandates that the "provision of an adequate education shall be a primary obligation of the State of Georgia . . ." Code Ann. § 2-4901. It provides for the establishment of a State Board of Education and the election of a State School Superintendent. Code Ann. §§ 2-5001; 2-5101. It provides for a Board of Regents for the University System of Georgia. Code Ann. § 2-5201. It grants authority "to county and area boards of education to establish and maintain public schools within their limits." Code Ann. §§ 2-5301; 5302. It preserves existing independent school districts. Code Ann. § 2-5306. It requires counties to "levy a school tax for the support and maintenance of education," and it imposes a duty on the General Assembly to "provide funds for an adequate education for the citizens of Georgia." Code Ann. §§ 2-5501; 2-5601. Nowhere in Article VIII is there any provision relating to the obligation of the General Assembly to equalize educational opportunities.

In view of the extensive treatment afforded the subject of public education in our state constitution, we believe the absence of any

---

[12] The disparities in per pupil expenditures under the Texas school financing system as presented in San Antonio School District v. Rodriguez, supra, appear to be substantially greater than those currently existing in Georgia. Id. at 15.

provision imposing an affirmative duty on the General Assembly to equalize educational opportunities is of constitutional significance. Although the Georgia Constitution provides for equal protection, "[e]very statement in a state constitution must be interpreted in the light of the entire document, and not sequestered from it . . ." Northshore School District No. 417 v. Kinnear, supra at 714.

However, given the applicability of equal protection principles to the instant case, we must conclude that the existing Georgia public school finance system is not subject to appellees' attack.

Appellees have argued that education is a "fundamental right" for purposes of state equal protection and that the Georgia public school finance system is therefore subject to "strict scrutiny." They rely on the following statement in San Antonio School District v. Rodriguez, supra at 33-34: "[T]he key to discovering whether education is 'fundamental' is not to be found in comparisons of the relative societal significance of education as opposed to subsistence or housing. Nor is it to be found by weighing whether education is as important as the right to travel. Rather, the answer lies in assessing whether there is a right to education explicitly or implicitly guaranteed by the Constitution. Eisenstadt v. Baird, 405 U. S. 438 (1972); Dunn v. Blumstein, 405 U. S. 330 (1972); Police Dept. of Chicago v. Mosley, 408 U. S. 92 (1972); Skinner v. Oklahoma, 316 U. S. 535 (1942)."

In our view, such an "answer" cannot govern state constitutional analysis. The "equal protection" clause of the Georgia Constitution itself provides: "*Protection to person and property is the paramount duty of government,* and shall be impartial and complete." (Emphasis supplied.) Code Ann. § 2-203. The "explicit or implicit" guarantee model, it can be seen, is one without meaningful limitation insofar as our state constitution is concerned.

"This is not to say that public education is not vital. Of course it is. Rather we stress how difficult it would be to find an objective basis to say the equal protection clause selects education and demands inflexible statewide uniformity in expenditure. Surely no need is more basic than food and lodging . . . Essential also are police and fire protection, as to which the sums spent per resident vary with local decision. Nor are water and sundry public health services available [on an equalized basis]." Robinson v. Cahill, supra. at 495-496.

"The prudent and correct path is to continue with an analysis of the equal protection argument along the traditional lines of the rational basis test." Thompson v. Engelking, supra at 803. See *Ingram v. Payton,* 222 Ga. 503 (150 SE2d 825) (1966). We reach this conclusion for several reasons.

First, "we stand on familiar ground when we continue to

acknowledge that the Justices of this Court lack both the expertise and the familiarity with local problems so necessary to the making of wise decisions with respect to the raising and disposition of public revenues . . . No scheme of taxation . . . has yet been devised which is free of all discriminatory impact. In such a complex arena in which no perfect alternatives exist, the Court does well not to impose too rigorous a standard of scrutiny lest all local fiscal schemes become subjects of criticism under the Equal Protection Clause.

"In addition to matters of fiscal policy, this case also involves the most persistent and difficult questions of educational policy . . . Education, perhaps even more than welfare assistance, presents a myriad of 'intractable economic, social, and even philosophical problems.' Dandridge v. Williams, 397 U. S. [471, 487 (1970)]. The very complexity of the problems of financing and managing a statewide public school system suggests that 'there will be more than one constitutionally permissible method of solving them,' and that, within the limits of rationality, 'the legislature's efforts to tackle the problems' should be entitled to respect . . . [T]he judiciary is well advised to refrain from imposing on the States inflexible constitutional restraints that could circumscribe or handicap the continued research and experimentation so vital to finding even partial solutions to educational problems and to keeping abreast of ever-changing conditions." San Antonio School District v. Rodriguez, supra at 41-43.

Finally, we deem it important that the U. S. Supreme Court has found the Texas system of public school finance "an inappropriate candidate for strict judicial scrutiny" (Id. at 44) and analyzed it under a "rational relationship" test. While the determination of the U. S. Supreme Court that education is not a "fundamental right" does not bind state courts to make the same determination, (see, e.g., Horton v. Meskill, 172 Conn. 615 (376 A2d 359) (1977)), the fact that education is not a "fundamental right" under the U.S. Constitution provides some guidance to the states. Consistency in constitutional adjudication, though not demanded, is preferred. See Northside School District No. 417 v. Kinnear, supra at 721. Olsen v. State, supra. Consistent with the holding of the U. S. Supreme Court in Rodriguez, as well as the decisions of the highest courts in a number of sister states, we hold that education per se is not a "fundamental right" and that the Georgia public school finance system must stand if it satisfies the "rational relationship" test. *Ingram v. Payton,* supra. Thus, if the Georgia school financing system "has a rational and reasonable basis and meets the educational mandate of our constitution [it] should, unless otherwise [invidiously] discriminatory or capricious, be upheld." Shofstall v. Hollins, supra

at 90-91.

The trial court held that, even under a "rational relationship" test, the Georgia system of financing public education must fall. With this conclusion, we cannot agree. The primary purpose of the APEG system is to provide basic educational funding to children throughout the state, and with the exception of RLE which "discriminates" in favor of property poor school districts, it does so on an essentially equal basis. Beyond APEG, the Georgia public school finance system preserves the idea of local contribution, perhaps out of concern "that along with increased control of the purse strings at the state level will go increased control over local policies." San Antonio School District v. Rodriguez, supra at 53. The fact that the state has not *funded* a large-scale equalization plan does not render the current public school finance system invidiously discriminatory.[13] In terms of equalization the system is a poor one. However, the system does bear some rational relationship to legitimate state purposes and is therefore not violative of state equal protection. Accordingly, the judgment of the trial court on the main appeal must be reversed.

## VI. *Conclusion*

Our holding that the current system of financing public education in Georgia is not unconstitutional should not be construed as an endorsement by this court of the status quo. Constitutions are designed to afford *minimum* protections to society. Plaintiffs have shown that serious disparities in educational opportunities exist in Georgia and that legislation currently in effect will not eliminate them.[14] It is clear that a great deal more can be done and needs to be done to equalize educational opportunities in this state. For the present, however, the solutions must come from our lawmakers.

*Judgment reversed on main appeal; affirmed on cross appeal. All the Justices concur.*

DECIDED NOVEMBER 24, 1981 —
REHEARING DENIED DECEMBER 15, 1981.

---

[13] The legislature has *enacted* a provision establishing "District Power Equalization." Code Ann. § 32-647a authorizes and directs the State Board of Education "to establish an equalizing fund whereby State funds, in addition to the amounts otherwise provided for by [Code Ann. Chapter 32-6A], shall be payable to certain local units of administration qualifying for such equalizing funds . . ." To date, District Power Equalization has not been funded.

[14] The fact that District Power Equalization has been enacted provides an indication that the legislature is aware of the problem. Until funded, however, such a program is but an empty gesture.

*Michael J. Bowers, Attorney General, Alfred L. Evans, Jr., H. Perry Michael, Carol Atha Cosgrove, Senior Assistant Attorneys General,* for appellants.

*Smith, Cohen, Ringel, Kohler & Martin, Warren C. Fortson, Bruce H. Beerman,* amicus curiae.

*Smith, Shaw, Maddox, Davidson & Graham, John M. Graham III, Long & Silverstein, David C. Long, Bennett, Wisenbaker, Bennett & Chapman, Barry R. Chapman, Tisinger, Tisinger & Vance, J. Thomas Vance, York, Cummings & McRae, Glenn T. York, Jr.,* for appellees.

APPENDIX.

## A HISTORY OF PUBLIC EDUCATION IN GEORGIA.

"While with the presentation of a thousand spelling-books to James Edward Oglethorpe by James Leake, in 1732, the first step was taken towards public education in Georgia, and while many private mission schools were established and maintained by local support, education was a privilege limited to those who could afford it. Recognizing the need for systematized public education the authors of the original State constitution (1777) inserted a clause providing that 'schools shall be erected in each county and supported at the general expense of the State, as the legislature shall hereafter point out and direct.' Although certain appropriations were made by the State for their support, these schools were forced to operate as private institutions and to rely on tuition fees. The rural sections of the State endeavored to meet their educational needs with small elementary institutions called 'Old Field Schools,' established jointly by patrons and teachers and conducted without State or county control or aid, in which were taught, 'reading, writing and the usual rules of arithmetic.' "[1] Although the Constitution of 1789 eliminated the education provision of the 1777 Constitution, a new provision was included in the Constitution of 1798: "The arts and sciences shall be promoted, in one or more seminaries of learning; and the legislature shall, as soon as conveniently may be, give such further donations and privileges to those already established as may be necessary to secure the objects of their institution; and it shall be the duty of the general assembly, at their next session, to provide effectual measures for the improvement and permanent security of the funds and endowments

---

[1] *State Board of Education v. County Board of Education of Richmond County,* 190 Ga. 588, 592-93 (10 SE2d 369) (1940).

of such institutions." "In 1817 the legislature made an appropriation for aiding elementary education, but this was limited to payment of tuition of children whose parents were unable to defray this expense, and such schools were known as 'poor schools.' "[2]

This effort was followed by an 1822 act providing for the education of "poor children."[3] "The poor school fund provided limited elementary education for numbers of children . . . [and] led the way toward tax supported schools."[4] In 1837, a bill was passed which established a "general system of education by common schools."[5] There was, however, no distribution of any funds appropriated for the system "because of the exhausted state of the treasury."[6] Due in part to the economic depression of 1837 to 1843, the legislature rescinded the 1837 act establishing the common schools.[7] By 1843 school funds for the poor were again available from the state, but public interest in "common schools" was minimal, and only fifty-three of ninety-three counties applied for their allotments.[8] The failure of this early free school system was attributed to "irregular aid from the state, unfortunate administration . . ., and popular indifference to the subject of common school education for all."[9]

Despite these problems, the legislature in 1858 was once again encouraged by prominent citizens to establish a common school plan, and "[f]or the second time in Georgia history, a common school system was set up."[10] One hundred thousand dollars annually, in addition to other state funds, was set aside from the earnings of the Western and Atlantic Railroad (a state owned railway) for public school education.[11] "The provisions of the law were broad enough to allow the people of any county to establish free schools and use their share of the funds for this purpose."[12] Thus, "[i]t may . . . be said that by 1858 the state was well on the way to a comprehensive system of common schools."[13] Amendments to the law a year later created

---

[2] Id. at 593.

[3] Ga. L. 1822, p. 11.

[4] Orr, *A History of Education in Georgia,* p. 81 (1950).

[5] Id. at 92-93

[6] Id. at 95.

[7] Ga. L. 1840, pp. 61-65.

[8] Orr, supra at 101.

[9] Slappey, *Early Foundations of Georgia's System of Common School Education,* Vol. 14, Georgia Historical Quarterly, pp. 139, 145 (1930).

[10] Orr, supra at 173.

[11] Ga. L. 1858, p. 49.

[12] Meadows, Modern Georgia, p. 133 (1954).

[13] Slappey, supra at 149.

county boards of education.[14] In 1860, Forsyth County was successfully operating a comprehensive free school system.[15] Apparently, the 1858 legislation "met with enthusiastic reception, and its benefits were being realized when the Civil War destroyed all chance to continue the work."[16]

"Many of Georgia's private and semi-private educational institutions were permanently closed as a result of the war between the States."[17] and neither the 1861 nor the 1865 Constitutions included a general education provision. "[A]fter the war a general movement for State-supported schools resulted in a legislative act in December, 1866, providing for a 'complete system of Georgia schools.' This act, however, never came into effect, on account of the consequences of the war."[18]

Despite the economic conditions of the post-war period, "constitutions which provided for public education were adopted generally. In every state in the South the attempt was made to inaugurate a school system under laws passed in accordance with the new constitutional requirements."[19] In Georgia, the Second Constitutional Convention was held under the Reconstruction Acts which had established a military commander for the state.[20] This convention proposed and the voters ratified a constitution which required "[t]he general assembly . . . [t]o provide a thorough system of general education, to be forever free to all children of the state, the expense of which shall be provided by taxation or otherwise."[21] The 1868 Constitution also created the office of school commissioner. Section III of Article VI stated: "The poll-tax allowed by this constitution, any educational fund now belonging to this State, except the endowment of and debt due to the State university, or that may hereafter be obtained in any way, a special tax on shows and exhibitions, and on the sale of spiritous and malt liquors, which the general assembly is hereby authorized to assess, and the proceeds from the commutation for militia service, are hereby set apart and devoted to the support of common schools. And if the provisions herein made shall, at any time, prove insufficient, the general

---

[14] Ga. L. 1859, p. 95.

[15] Meadows, supra at 133.

[16] Orr, supra at 178.

[17] *State Board of Education v. County Board of Education of Richmond County*, supra at 593.

[18] Id. at 593.

[19] Meadows, supra at 133.

[20] McElreath, *Constitution of Georgia*, pp. 152-53 (1912).

[21] 1868 Constitution, Art. VI, § 1. Code of 1873, p. 925.

assembly shall have power to levy such general tax upon the property of the State as may be necessary for the support of said school-system. And there shall be established, as soon as practicable, one or more common schools in each school-district in this State."[22] In 1870, the General Assembly enacted the first comprehensive public school law.[23] This legislation established a state board of education and provided for appointment of a school commissioner, who was authorized "to apportion equitably" revenue raised under the statute "to the different school districts of the state upon the basis of the aggregate of youths between six and twenty-one years of age in each district."[24] In order to finance public education, the 1870 act provided that a common school fund be established comprised of the poll tax, the taxes on shows, exhibitions, spiritous liquors and various other sources, including one-half of the earnings of the Western and Atlantic Railroad. "[A]nd it shall be the duty of the State Board of Education to determine the amount which, in addition to the foregoing, should be raised annually by taxation upon all the taxable property of the State, and to report annually to the General Assembly the estimate which they may find necessary to support a school in every school district in the State, of at least three months in each year, in the manner provided in this act, the same to be apportioned with other funds, as hereinafter directed."[25] The act further required that "each and every county . . . shall compose but one school district" and be managed by a board of education, which was responsible for the daily maintenance and operation of school facilities. Funds for operation "shall be raised by a tax levied upon the taxable property of [the] district . . . "[26]

The 1870 legislation resulted in the "first real school organization . . . Numerous schools were put in operation, but even then the question of finances began to cast a menacing shadow across the public school system," for the legislature (as well as corrupt officials) had diverted the school fund to other purposes, leaving a debt of $300,000.00.[27] School official and teachers were left unpaid.

In 1872, a new school commissioner was appointed and his efforts were directed toward eliminating the debt, and establishing sound financial funding from the state.[28] The public schools at this

---

[22] 1868 Constitution, Art. VI, § 3.
[23] Ga. L. 1870, pp. 49-61.
[24] Id. at 51.
[25] Id. at 60.
[26] Id. at 57.
[27] Meadows, supra at 134.
[28] Orr, supra at 214-19.

time were characterized by a lack of uniformity: they were "as varied as the policies of the county officers. Rich communities had their teachers, and the poor were left in ignorance, unable to import and pay a private teacher . . .."[29]

Under the new commissioner's leadership, legislation was passed in 1872 to pay teachers who were unpaid in previous years and to replace school funds which were used for other purposes. Additional legislation sought to "perfect the public school system" and "to clarify former inconsistencies in the school law."[30]

At this time, if a county provided free schools for three months per year, then the county was entitled "to draw her proportionate part of the state fund . . ."[31] By the mid-1870's "there was a decided advance in public sentiment in favor of public schools," and the commissioner continued to work for increased school funding.[32]

A new state constitution was adopted in 1877. It provided that "there shall be a thorough system of common schools, as nearly uniform as practicable, the expense of which shall be provided for by taxation or otherwise."[33] Although this language was similar to the language of the 1868 Constitution, the new constitution went on to provide that "[a]uthority may be granted to counties, upon the recommendation of two grand juries, and to municipal corporations, upon the recommendation of the corporate authority, to establish and maintain public schools in their respective limits, by local taxation; but no such local laws shall take effect until the same shall have been submitted to a vote of the qualified voters in each county or municipal corporation, and approved by a two-thirds' vote of persons qualified to vote at such election; and the General Assembly may prescribe who shall vote on such question."[34] While county taxation of property for schools was thus authorized under the 1877 Constitution, it remained difficult to obtain local approval. The Constitution did, however, authorize the legislature to provide funds for education through general property taxation.[35]

In 1889, the General Assembly provided for the levy of a general property tax for the support of the common schools.[36] Under this

---

[29] Meadows, supra at 134.

[30] Ga. L. 1862, pp. 62 and 64. See Orr at 216.

[31] Ga. L. 1872, p. 68. See Orr at 217.

[32] Orr, supra at 219.

[33] 1877 Constitution, Art. VIII, § 1, Par. 1.

[34] 1877 Constitution, Art. VIII, § 4. Par. 1.

[35] Orr, Supra at 225. Cf. the similar provision in the 1868 Constitution at n. 21 supra.

[36] Ga. L. 1889, p. 33. See Jones, *Education In Georgia,* p. 34 (1889).

legislation and later amendments, the school fund was obtained by a direct state tax of 1.4 mills. The fund reached $600,000.00 by 1896. Any development of the program for local taxation, however, "was considered inexpedient by the legislature because of the general poverty."[37]

Despite somewhat improved economic conditions at the turn of the century, funding for public schools remained insufficient. Although the state school fund grew to over $1.5 million, the expenditure per pupil only increased from $3.52 in 1890 to $4.84 in 1900.[38] "It was felt that the great need ... in 1900, as it had been since the inauguration of the public school system, was legislation providing for local taxation."[39]

With a few notable exceptions, there was little success under the 1877 Constitution in establishing local support for public schools through local taxes. In the early 1900's a constitutional amendment was proposed (known as the McMichael Law) which granted authority not only to counties and municipal corporations, but also to *militia* and *school districts* "to establish and maintain public schools. ... by local taxation" if approved by two-thirds of the voters.[40] This amendment was ratified in 1904[41] along with another which limited the state rate of ad valorem taxation for schools to 5 mills.

New implementing legislation was passed in 1906[42] which "allowed county boards to lay off counties into districts of approximately sixteen square miles, unless natural obstacles required smaller districts ... The provision for discretion on the part of the county boards of education in the case of providential obstructions was made the loophole of escape from the whole law. The boards availed themselves of the privileges of the bill to fence off the richest portion of the county (often the part containing railroad crossings or corporations that could be taxed) and to vote additional

---

[37] Orr, supra at 251-52.

[38] Id. at 259.

[39] Under local legislation several school systems had developed separately from the general system. In 1866 Chatham County and the City of Columbus established school systems. The Atlanta system was formed in 1870. Several systems were in operation by 1885. Jones, supra at 36. "The four counties in the state which imposed local taxation were in the most prosperous condition, and the schools there were outstanding. People were moving rapidly into those sections and particularly into Atlanta where the tax was highest." Orr, supra at 259-60.

[40] Ga. L. 1903, p. 23. This amendment did away with the need for two successive recommendations by the grand jury for local taxation. See n. 34 supra.

[41] The amendment was not self-executing. *Brooks v. Town of Loganville,* 134 Ga. 358 (67 SE 940) (1910).

[42] Ga. L. 1906, p. 66.

school taxes for that district. The large increase in the number of schools which resulted was caused by the ignorant selfishness of a few patrons, and the unwillingness of the county boards to incur anger by resisting unreasonable demands. This shortsighted and selfish policy, together with the tendency of cities and towns to secure charters from the legislature and to withdraw from the county system, caused a multiplicity of systems to arise. Since the state appropriations were insufficient to maintain the type of school desired and since the legislatures had not passed any law permitting the people to vote for a district or county-wide tax, there had arisen numerous independent and semi-independent systems in cities, towns, and villages. The independent systems dealt only with the state department and received their pro rata share of state funds directly. The others received their shares through county officials and made all required reports through the same source. Seventy chartered towns drew money from the educational department of the state in 1909, and eighty others received money from county commissioners. All charters were different, and each sought some special advantage at the expense of the country districts. The rural districts were left with the least valuable part of the property from which to derive revenue. Thousands of citizens moved to the city, and the deserted farms increased the cost of food and living expenses until the city dwellers were hurt as well as their rural neighbors. The laissez-faire system based on individualism, so long esteemed in the state, had run itself into the ground."[43]

The primary focus during the following decade was on consolidation of primary schools and high schools *within the county*. These efforts were made under the "principle of equalization," stressing that the basic unit of organization "should be the *county*, not the *district*."[44] (Emphasis supplied.)

"By 1917 . . . the aggregate of the local tax for the support of the common school system had grown to equal the total amount of state appropriation."[45] Yet despite a constitutional amendment to *require* counties to levy a local tax of "not less than one nor more than five mills" for support of their schools[46] and new legislation to provide increased funding for consolidation of a county's smaller schools,[47] "great inequities in educational advantage persisted . . . It became apparent that local taxation was not the cure for all the ills that

---

[43] Orr, supra at 262.
[44] Id. at 272.
[45] Id. at 274-75.
[46] Ga. L. 1919, p. 66.
[47] Ga. L. 1919, p. 287.

existed. Inequalities in economic conditions caused wide variations in educational advantages. In some districts, far from railroads and without any corporate property to tax, the people made heroic sacrifices to support schools. In some instances, they taxed themselves more than twenty mills instead of the required five, but their farm land had so little value that only a six months' school term could be maintained.[48]

"Data taken from an educational survey of elementary and high schools conducted in 1925 by the state department brought to light startling facts. The wealth of the state was highly localized in a few counties; approximately one half was found in ten counties, and the assessed value of wealth in the ten lowest counties constituted less than 1 percent of the total assessed value of the state. The concentration of wealth in cities made it possible to realize large sums from a low tax rate, especially where large industrial corporations paid taxes.

"Even if the tax rates were made confiscatory, these inequalities would not be overcome. As a matter of fact, the higher the valuation of property, the less burdensome taxes become in proportion to ability to pay, and ability to pay was reached only after a certain earning power had been attained. Differences with respect to ideals for school standards were far-reaching, and it seemed to be the part of wisdom to set up for each locality a minimum school standard which would represent the minimum educational opportunity in the community for which the state would assume responsibility.[49]

"It was obvious that better normal facilities were needed; that a better program should be developed for training teachers in service; that a fund should be created with which to equalize the length of term; that salaries of teachers and county superintendents should be based upon educational qualifications in all counties of the state; that an adequate number of supervisors should be employed; and that the consolidation of weak schools through a building fund should be brought about . . .

"[I]t was seen that new and definite sources of revenue had to be found by which the state's contribution to the public school fund could be materially increased. To meet the situation the Georgia Education Association originated and sponsored the Equalization

---

[48] Orr, supra at 275. The 1919 constitutional amendment specifically provided: "No additional election shall be required to maintain any local school tax now in existence in districts, counties, or municipalities, provided this bill shall not apply to counties having a local school system of taxation adopted prior to the Constitution of 1877."

[49] Orr, supra at 275-76.

Fund Law.[50]

The Equalization Act as drawn up by a legislative committee had substantial support. On March 13, 1926, the Act was approved. "It provided an extra appropriation in addition to the regular appropriation for the purpose of equalizing the educational opportunities for the children of the state, but the fund to put the scheme into operation was to be furnished by the legislature in 1927."[51]

In 1927 an appropriation of $1 million was made. "A tax consisting of one half cent on each gallon of gasoline and one cent on each gallon of kerosene oil sold in the state was collected for the fund and distributed in 1927. In apportioning the fund among the counties, the state board of education had to take into consideration the possible returns from taxable values for school purposes, the extent to which the local tax aid had been utilized, the educational needs, and the local inequalities existing in the several counties. No county or independent system could share in the equalization fund for any year unless it had levied five mills for a local tax for schools for that year. After the passage of the Equalization Act in 1926, many towns asked to have their charters repealed so that they might function as part of the county system and take advantage of the distribution.[52]

Despite the passage of the 1926 Equalization Act, "the financial load upon the weaker counties was still too great . . ."[53] Educators focused their efforts on shifting the tax burden from the local to the state level "in order to equalize more nearly opportunities for rural children." This approach was heightened when the great depression caused the "collapse of local support" and many schools closed or had shortened terms.[54]

In response to these difficulties, groups such as the Georgia Teachers' Association and the Georgia Education Association advanced legislative proposals relating to public education. The latter association called for the following: "(1) a strong state board of education; (2) state support of all public schools for a period of seven school months each year; (3) dual (state and local) support for public

---

[50] Id. at 276-77.

[51] Id. "This was the beginning . . . of what was known for 25 years as the Equalization Fund, and which continued to exist until the financing of the Minimum Program of Education in 1951." Report of Joint House and Senate Committee on Education, 1953, p. 22 (hereinafter, 1953 Report).

[52] Orr, supra at 278.

[53] Id. at 283.

[54] Id.

education; (4) a state salary schedule for teachers; and (5) higher qualifications for teachers."[55]

Based on these proposals, a legislative committee drew up a bill "which provided for the equalization of educational opportunity and for a school year of nine months minimum duration." Local school systems were classified in four groups, based on census figures.[56] After several amendments giving "rural and small-town schools a larger proportion of the funds," the bill passed the legislature. It was vetoed, however, by the governor.[57]

The Georgia Education Association continued to press for improved educational conditions. Their president, S. V. Sanford, maintained "that the solution of public education was dependent upon the tax problem and that *equality of opportunity rather than equality of expenditures* should be the unit of service. The inequalities which existed in the system of taxation indicated the need for a new tax act."[58] (Emphasis supplied.)

"A well-planned campaign was arranged to push the educational program in 1936. Three bills were prepared: one to provide for a seven-months' school term; another, free schoolbooks; and still another, a lay board of education."[59]

The three bills endorsed by Governor E. D. Rivers were introduced on January 15, 1937. "House Bill No. 123, known as 'Seven Months State Supported School Bill,' guaranteed a minimum of a seven months' school term for every child in the state by providing for the state to pay teachers for seven months and the administrative costs of running schools for seven months. Each county was entitled to a certain number of teachers to be paid from the state fund, the number depending upon the school population of the county and the density of population. To secure the fund each county had to levy a five-mill tax and, if this yielded an amount less than one-third of the amount alloted for teachers' salaries, the state fund made up the difference.

"The fund was distributed on the basis of the excess of the local need over the ability of the local system to meet it. The need was determined by the amount required to maintain the standards set by the state minimum program, and the ability was measured by the amount allotted by the state under the seven months' school law

---

[55] Id. at 284-85.
[56] Id. at 287.
[57] Id. at 289.
[58] Id.
[59] Id. at 290.

added to the amount received under the five-mill local tax. However, no system could receive more than $40,000 in one year. The amount to be received varied from year to year."[60]

The two other bills provided for free textbooks to be furnished by the state and a state board of education with one lay member from each congressional district.

"In the Act of 1937 ... the principle of per capita apportionment of funds was abandoned."[61] Teacher salaries were based on certificates issued by the state and "local systems were allotted teaching units based upon average daily attendance ... In addition, the Equalization Fund was distributed on basis of need for aid in extending terms beyond seven months, for transportation, etc." In short, with funding of the 1937 Act the "Minimum Foundation Program for Education" (MFPE) had begun. The older equalization concept was incorporated into the new formulas to more nearly equalize educational opportunities statewide.[62]

Nevertheless, disparities continued. One report entitled "A Survey of Public Education of Less Than College Grade in Georgia" showed wide variations in wealth, "reflecting differences of financial abilities . . . to support schools on local levels."[63]

It was in this context that the Constitutional Revision Commission convened on October 1, 1943.

JORDAN, Chief Justice, concurring.

I agree with the holding of the opinion which (1) affirms the trial court's judgment that the existing method of school funding in this State does not violate the constitutional provision which provides "that an adequate education for the citizens shall be a primary obligation of the State of Georgia, the expense of which shall be provided for by taxation" and (2) which reverses the judgment of the trial court which held that public school financing system in Georgia is unconstitutional in that it violates the equal protection clause of the Georgia Constitution.

It is an uncontroverted and unassailable fact developed by the record in this case that every child in Georgia does not have an "equal

---

[60] Id.

[61] Ga. L. 1937, pp. 882-91. 1953 Report, supra n. 51 at 33.

[62] Id. MFPE is the precursor of APEG. The 1937 Act was codified as Code Chapter 32-6 and entitled "Equalization of Education Opportunities." The act was repealed by Ga. L. 1949, pp. 1406, 1420, and a new Code Chapter 32-6 entitled "Minimum Foundation Program" (MFP) was substituted for it. MFP was funded by Ga. L. 1951, pp. 417, 420, 439. APEG, which was enacted in 1974, is largely based on the concepts embodied in MFP.

[63] 1953 Report, supra at 43-44.

educational opportunity." The evidence authorizes the conclusion of the learned trial judge that "The educational opportunities being provided in poor districts are not equal to those being provided in wealthy districts." However, after an exhaustive study of our Constitution and our system of school funding, we have come to the conclusion that the public school financing system does not violate the state equal protection provision.

While seeking to provide an equal educational opportunity for each child in Georgia is a laudable goal, and the apparent intent of the appellees in this case, several drastic actions would be required, in my opinion, to bring about even the theoretical achievement of that goal. Among those actions would be:

(1) The abolition of the independent school districts;

(2) 100% financing of the schools by the State;

(3) A prohibition against any local supplement to education, and,

(4) A revision of the tax structure of the State, including the abolition of the system of ad valorem taxation.

The appellees suggest that these actions are not necessary, but offer no alternative solutions in their advocacy of equal educational opportunity.

As to (1) above, it is indisputable that the independent school districts in this State offer educational opportunities superior to their "country cousins" simply because these systems have a higher tax base per pupil upon which to levy taxes. Indeed, this litigation had its genesis because the Whitfield County system recognized the disparities which existed between it and the City of Dalton independent system. These independent systems came into being when the State funds were nil or meager and the local effort contributed almost entirely to the operation of the schools. While this trend has almost completely reversed itself, the operation now being mostly state funded, (and as was evident in 1945), the writers of the 1945 Constitution could not muster the political courage to abolish the independent systems. However, recognizing the apparent evil generated by the educational disparities between independent and county systems, that Constitution did prohibit the creation of any additional independent systems.

As to (2) above, we are fast approaching the point when the "need" of each school district as determined under the APEG formula will be almost completely met by State funds. This is true because the cost of education is spiraling with inflation, yet the required local effort (RLE) is pegged at a total of $ 78,600,000. The State is now funding APEG at a level of almost $ 800,000,000 in fiscal 1981, or slightly above 90% of the total needed under the APEG

formula. One-hundred percent state financing for public education is not a new idea. Indeed, it was embedded in our very first Constitution in 1777 which provided that "schools shall be erected in each county and supported at the general expense of the State." We have come almost full circle back to that principle after more than 200 years.

As to (3) above, it is the "fly in the ointment." To achieve the result prayed for by the appellees, i.e., an equal educational opportunity for each child in Georgia, there can be no local supplement to APEG funds. Yet, it is apparent that all of the 187 school systems in Georgia are contributing to the operation of the system in amounts over the RLE, some substantially more than others. As long as this situation exists, the wealthier districts will continue to expend more money per pupil, with all its attendant benefits, than the poorer districts.

As to (4) above, if the State provides total funding for education in Georgia a drastic revision of the tax structure would be required. Such a revision should include the abolition of the ad valorem system of taxation. Ad valorem taxation is antiquated, outmoded; unfair and violates equal protection. It places an undue burden on the property owner as opposed to those who own intangible assets. As an example, one person owns $100,000 in Georgia Power Company stock or some other domestic corporation. He pays no taxes on this capital. Another person has $100,000 in cash in a bank. He pays an intangible tax of $10.00. Another person owns a house or farmland worth $100,000. He pays several thousand dollars or more per year in ad valorem taxes, depending upon the county in which he lives. Yet each of these persons owns property of equal value and each has the same "net worth" on a financial statement. The unfairness is apparent. Ad valorem taxation has been practically abandoned at the State level. It should be abandoned at the local level in favor of the more equitable sales, income, and use taxes.

I am heartily in favor of equal educational opportunities for every child in Georgia and regret that the tremendous amount of money expended on education in this State has not achieved this result. Whether or not it can ever be done lies, at least for the present, with the General Assembly and not with this Court.

HILL, Presiding Justice, concurring.

Cases involving equal protection and lack of wealth present unique problems. Such cases may involve indigent defendants or, as here, they may involve school districts lacking wealth. In such cases, one question should be: Does equal protection require equality of

treatment, or equality of result?[1]

State universities and colleges charge uniform tuition. No one suggests that uniform tuition violates equal protection because we think here of equality of treatment. If, on the other hand, we were to think in terms of equality of result, indigent students could demand a free college education.

Similarly if, instead of APEG, the state were to grant to each school district the uniform sum of $800 per student in ADA, that would be equality of treatment but not equality of result. The state has chosen not to use equality of treatment in APEG and the question here is, must the state provide equality of result.[2] In order to answer this question, we must first decide whether education is a fundamental right because if the answer to that question is affirmative, then equality of result may well be mandated.

With this distinction between equality of treatment and result in mind, I agree with the majority opinion in all respects except one. I agree with the majority that under our equal protection clause, although education is a primary obligation of the state, Code Ann. § 2-4901, it is not a fundamental right under the constitution, and therefore equality of result is not mandated. As for satisfying the rational relationship test on the basis of local control of education, including local control of taxation, it is admitted that poor school districts cannot remedy the existing disparities in expenditures per child, and I do not find that the constitutional deprivations of those students adversely affected (and on whose behalf this litigation was brought) are justified by treating local control as a legitimate governmental purpose. However, I would find that even under the intermediate level of judicial scrutiny, the system of financing public education (APEG plus local supplementation) at present is substantially related to the important governmental objective of allowing those school districts capable of doing so to provide their students with a better education. I therefore concur in the judgment of the court.

---

[1] The question arises in cases other than those involving lack of wealth.

[2] A wealthy school district could challenge, probably not successfully, the state's failure to use equality of treatment.