COOK, Justice.
These eases offer us another opportunity to review trial court proceedings in what has come to be known as the “Public School Equity Funding Case.” See Pinto v. Alabama Coalition for Equity, 662 So.2d 894 (Ala.1995); and Opinion of the Justices No. 333, 624 So.2d 107 (Ala.1993). Those two opinions adequately set forth the facts underlying this dispute, and we will not rehearse them unnecessarily in this opinion. The following pertinent events have transpired since we released Pinto:
In a motion filed on or about May 15, 1995, Governor Fob James, Jr., and Finance Director James Baker asked Judge Eugene Reese, of the Montgomery Circuit Court, to recuse from further proceedings in the case. The motion alternatively requested that *872 Judge Reese. solicit an advisory opinion from the Judicial Inquiry Commission (“Commission”) as to his qualification to preside further over the case. On August 18, 1995, the Commission issued an opinion holding that Judge Reese was “disqualified from continuing to sit in the case.”
The Commission reached this conclusion on the basis of Canon 3(C)(1), Alabama Canons of Judicial Ethics, which states that “[a] judge should disqualify himself in a proceeding in which his ... impartiality might reasonably be questioned.” Although it found no evidence of “actual bias,” the Commission concluded that the totality of circumstances surrounding the case afforded “a reasonable basis for questioning the judge’s impartiality.” In particular, the Commission noted the manner in which the case had been discussed and debated by both candidates in the 1994 Democratic Primary campaign for the office of Associate Justice of the Alabama Supreme Court (Judge Reese was one of those two candidates). Also, the Commission noted that the “case [was] still pending,” and that issues as to which Judge Reese had “publicly declared his leadership [would be] presented to him for reconsideration.” Thereafter, on August 23, 1995, Judge Reese withdrew from the case and it was reassigned to Judge Sarah M. Greenhaw.
On September 15, 1995, Governor James, Finance Director Baker, and Attorney General Jeff Sessions (“State parties”) jointly moved the trial court to vacate the orders relating to both the Liability Phase, and the Remedy Plan, and to dismiss the action for lack of subject matter jurisdiction. A motion filed earlier by the Pinto intervenors sought similar action as to the Remedy Plan. On October 6, 1995, the trial court denied the motions. Also, pursuant to Ala. R. Civ. P. 54(b), it expressly determined “that there [was] no just reason for delay and ... directed] the entry of final judgment as to the” Remedy Plan. At that time, Judge Greenhaw struck ¶XI(F) of the Remedy Plan, which stated: “Retention of Jurisdiction — The court hereby retains jurisdiction of this matter and will issue such further orders as may be required to secure the implementation of its orders.”[1]
On October 12, 1995, the State parties petitioned this Court, pursuant to Ala. R. App. P. 5, for permission to appeal from the judgment entered on October 6,1995, insofar as it overruled their motions to dismiss the action. The cases- numbered 1950030 and 1950031 represent those petitions. On November 8, 1995, the State - parties appealed from the judgment that had been certified under Rule 54(b) as final; that judgment consisted of the Remedy Plan. Cases 1950240 and 1950241 represent those appeals. Also, in eases 1950408 and 1950409, the Pinto intervenors appealed from the certified judgment.
On February 6, 1996, after these appeals were filed, the trial court, over the objections of the State parties, appointed “an independent monitor ... to oversee the implementation of the Remedy Plan.” It also granted “attorneys for [the] plaintiffs ... leave to make application for ah award of attorneys’ fees,” and set dates for the filing of “fee declarations requesting payment of attorney fees and expenses, with supporting documentation.” On March 14, 1996, the State parties petitioned this Court for a writ of prohibition, or, alternatively, a writ of mandamus, directing the trial court to vacate its February 6 order and to stay the proceedings in the trial court pending the resolution of these appeals. Case 1950917 represents this petition. Cases 1950030, 1950031, 1950240, 1950241, 1950408, 1950409, and 1950917 have been consolidated for resolution on appeal. We shall address the issues peculiar to each of the seven eases, arranging the parts of this opinion according to the sequence in which the cases are numbered.
I. Cases 1950030 and 1950031 — Petitions for Permission to Appeal
The State parties seek permission, pursuant to Ala. R. App. P. 5, to appeal the denial of their motion to vacate all previous orders and to dismiss the action. Their petition challenges, primarily on constitutional grounds, the validity of the Liability Phase — in addition to challenging the Reme *873 dy Plan. More specifically, the State parties argue that the trial court’s holdings as to both Phases of this action violate the separation of powers doctrine.
Ordinarily, we would, before reviewing issues pursuant to Rule 5, order briefs from opposing parties. In this case, however, the issues involved in cases 1950030 and 1950031 are the same issues presented in cases 1950240 and 1950241, and in those cases the issues have been fully briefed by the opposing parties. For this reason, and because the Remedy Plan is not yet final and appeal-able, we grant the petitions and review the issues pursuant to Rule 5. We shall explain the present procedural posture of the Remedy Plan before addressing the merits of the State parties’ arguments.
Procedurally and substantively, the Remedy Plan differs from the Liability Phase. In the text of Pinto, we set forth several sections of the Remedy Plan as evidence that “the court intended to oversee and direct the processes of education ‘reform’ for an indefinite period,” that is, as evidence of its inherently interlocutory nature. 662 So.2d at 899 (emphasis added). After reproducing several exemplary excerpts from the Remedy Plan, we stated:
“These and numerous other provisions of the Remedy [Plan] [emphasis added] obviously contemplate perennial revision and reassessment [emphasis in Pinto ] of the progress of the process, the purpose of which is to convert a system that failed to ‘offer equitable and adequate educational opportunities to the schoolchildren of the state,’ Opinion of the Justices, No. 338, 624 So.2d 107, 110 (Ala.1993) (emphasis added [in Pinto]), into a system that succeeds in doing so.”
662 So.2d at 899. We described this objective as an “ambitious” one — one that could not “be achieved without significantly impacting — directly or indirectly — virtually every Alabama citizen for years to come.” Id. at 899-900.
Thus, it was not merely ¶XI(F) of the Remedy Plan that rendered the Remedy Plan interlocutory.[2] Indeed, Judge Green-haw, in her order of October 6, 1995, in an apparent attempt to facilitate appellate review of the Remedy Plan, stated:
“[I] In the Remedy Order the trial court specifically retained jurisdiction to issue further orders required to secure implementation. [II] Inasmuch as this court has made the Remedy and Remedy Approval Orders final, for purposes of the record Sec. XI(F) of the Remedy Order is set aside. [Ill] However, the court would note that it has inherent power to issue such orders as necessary to render its judgments effective....”
(Emphasis added.)
These three sentences succinctly illustrate the difficulties inherent in attempt-, ing to convert to a final judgment the Remedy Plan in toto. Essentially, sentence three replaced what sentence two purportedly removed — the power of the trial court to “re-viste] and reassesá[ ] ... the process,” Pinto, 662 So.2d at 899, in other words, to modify the Remedy Plan as necessary. As we explained in Pinto, the Remedy Plan is interlocutory by its very nature and will remain so until an educational system that complies with the constitution is in place. It was designed to remain modifiable in order to accommodate, among other things, legislative and executive action. Thus, unlike the Liability Phase, which “ascertained and declared the rights of the parties,” Taylor v. Taylor, 398 So.2d 267, 269 (Ala.1981), by declaring the challenged system unconstitutional, and which became final on June 9, 1993, the Remedy Plan does not “ascertainf ] and de-claret ] the rights of the parties and settle[ ] the equities” as to any party in this action. Such a disposition is a prerequisite for a Rule 54(b) certification of finality. See Tanner v. Alabama Power Co., 617 So.2d 656, 656 (Ala.1993) (Rule 54(b) “confers.appellate jurisdiction over an order of judgment only where the trial court ‘has completely disposed of one of a number of claims, or one of multiple parties’ ” (emphasis in Tanner)).
*874 In short, Rule 54(b) cannot make the Remedy Plan in toto a final and appealable judgment. Review of specific orders implementing specific provisions may be obtained, however, in a manner to be discussed more fully in Part III.C. of this opinion. That was the sense of this Court’s order denying Governor James’s petition for a writ of prohibition in Ex parte James (no. 1940679); that order stated: “[I]ssues regarding other orders may be raised on appeal in accordance with the Alabama Rules of Appellate Procedure when such orders become final.” Pinto, 662 So.2d at 898 n. 2. That this statement has apparently been misunderstood by the parties and the trial court is one consideration that has prompted our decision to grant the Rule 5 petition at this time.
We turn now to the merits of the arguments. The State parties challenge the validity of the judgments on which both the Liability Phase and the Remedy Plan are based, on three grounds. First, they contend that these judgments violate the separation of powers doctrine. Second, they argue that this action — up to, and including, the time of the entry of the order setting forth the Remedy Plan — was not sufficiently adversarial to render the action justiciable. Thus, they insist, the trial court lacked subject matter jurisdiction to enter any of the orders material to this action. Third, they insist that “campaign conduct of Judge Reese draws in question the impartiality of the entire judicial proceedings.” Brief and Arguments of Appellants, at 27. For ease of discussion, we shall address these contentions in reverse order.

A. Campaign Conduct

In his unsuccessful bid for a seat on this Court in the 1994 election campaign, Judge Reese’s campaign circulated literature categorizing him as “the judge for educational reform,” and .stating, among other things: “Gene Reese is a tough judge. Last year, he became famous for ruling Alabama’s education system unconstitutional and telling a Governor and the Legislature to fix the problem. ... Now, Gene Reese is running for Alabama Supreme Court — and he will be a tough Justice for change.” Brief and Argument of Appellants (Cases 1950240 and 1950241), at App. A. This conduct, it is contended, created an- atmosphere that could be perceived as judicial bias, and thus compromised the integrity of this action in toto.
“Due [p]rocess ... entitles a person to an impartial and disinterested tribunal in both civil and criminal cases.” - Marshall v. Jerrico, Inc., 446 U.S. 238, 242, 100 S.Ct. 1610, 1613, 64 L.Ed.2d 182 (1980). Trial before such a tribunal “helps to guarantee that life, liberty, or property will not be taken on the basis of an erroneous or distorted conception of the facts or the law.” Id. In facilitating this principle, Canon 3(C)(1) prevents a judge from exercising discretion in a case where the demonstrated facts make it “reasonable for a party, for members of the public, or for counsel to question [his] impartiality.” Bryars v. Bryars, 485 So.2d 1187, 1189 (Ala.Civ.App.1986) (recusal was .required under such facts even without evidence of “actual bias”).
Neither the State parties nor the Pinto intervenors contend that the Liability Phase, which was made final on March 31, 1993, or the Remedy Plan, which was entered on December 3, 1993, were accompanied by conduct evidencing actual bias. Judge Reese’s 1994 campaign advertisements and activities transpired after the Liability Phase order was entered. Moreover, Judge Reese’s recu-sal was not sought by any party in this action, as far as the record reveals, until May 1995, when the State parties moved for it. Thus, the contentions are, in effect, that the Commission’s order of disqualification, which was based on the activities of the 1994 campaign, should be applied retroactively to nullify even the actions taken many months before any of the challenged campaign conduct occurred.
We disagree with these contentions. Other courts have held that “[o]rders entered prior to the recusal motion are unaffected by its disposition, absent a showing of actual bias.” Liberty Lobby, Inc. v. Dow Jones & Co., 838 F.2d 1287, 1302 (D.C.Cir.) (emphasis added), cert. denied, 488 U.S. 825, 109 S.Ct. 75, 102 L.Ed.2d 51 (1988). The United States Court of Appeals for the Seventh Circuit observed: “Our research has not turned *875 up any case involving mere appearance of impropriety in which the court has set aside decisions that had been taken by the district judge before any party asked for recusal.” United States v. Murphy, 768 F.2d 1518 (7th Cir.1985), cert. denied, 475 U.S. 1012, 106 S.Ct. 1188, 89 L.Ed.2d 304 (1986). See also United States v. Widgery, 778 F.2d 325, 328 (7th Cir.1985) (“Disqualification for the appearance of impropriety runs prospectively only; even a successful motion does not vitiate acts taken before the motion was filed”).
If orders entered by a trial judge before recusal is requested are valid, then, a fortiori, orders, such as those in this case, that were entered before the questionable conduct occurred are valid. Thus, we hold that where a party seeks the recusal or disqualification of a trial judge on the ground that “his impartiality might reasonably be questioned,” that is, without evidence of actual bias, orders entered by that judge before the occurrence of the conduct for which recu-sal was sought are valid.
This holding does not, however, entirely resolve a contention, peculiar to the Pinto intervenors, regarding the Remedy Plan. Specifically, they state:
“Judge Reese called his judicial independence into question by appearing at an event to be publicly honored by a party to the pending litigation. In April 1993, pri- or to the Remedy Plan, Judge Reese attended the State [Parent Teachers Association (‘PTA’) ] 1993 annual convention in Huntsville, Alabama. Dr. Wayne Teague, a party defendant/plaintiffidefendant and State Superintendent of Education, introduced Judge Reese, read excerpts from his Liability Order, and praised both to the standing ovation of the crowd. Birmingham News, April 17, 1993, p. 1A .... [The] Association actively campaigned for the proposed remedy plan to be implemented. This activity alone warrants disqualification.”
Brief of Pinto Appellants, at 27-28 (emphasis added).
Unlike the Liability Phase, the Remedy Plan was entered after the PTA convention, but well before the motion for recusal or disqualification. We need not decide whether this distinction requires a different result, because, we conclude, this challenge by the Pinto intervenors to the Remedy Plan is due to be rejected pursuant to another rule. Specifically, “[i]t has been held that the subsequent approval or ratification by [a] qualified judge of the invalid acts of [a] disqualified judge has the effect of relieving the case of any objection to the proceedings based on the ground of the disqualification of the regular judge.” 48A C. J.S. Judges § 157, at 865 (1981). Otherwise stated, “[a]n order of a judge made prior to his disqualification is in effect set aside by a similar order made by the new judge to whom the case is submitted after the original judge has stepped out of the case.” Id. See Carpenter v. Pacific Mut. Life Ins. Co., 10 Cal.2d 307, 74 P.2d 761 (1937), aff'd, 305 U.S. 297, 59 S.Ct. 170, 83 L.Ed. 182 (1938); Garrison v. Marietta Trust & Banking Co., 155 Ga. 562, 118 S.E. 48 (1923).
After Judge Reese withdrew from this case on August 23, 1995, it was reassigned to Judge Greenhaw. In their motion filed on September 15, 1995, the State parties directly presented Judge Greenhaw with issues going to the merits of the Remedy Plan. They contended that the action must be dismissed, because (1) the circuit court had no power “to require the Governor and legislature of Alabama ... to take certain specific actions,” and (2) the'judgment was invalid because of the appearance of bias created by Judge Reese’s campaign activities.
The question of the court’s jurisdiction was, of course, identical to the question resolved by Judge Reese before he withdrew from the case. Judge Greenhaw reviewed the Remedy Plan de novo. Thus, Judge Greenhaw’s October 6, 1995, judgment, which rejected the State parties’ arguments and denied their motion, effectively superseded, or “set aside,” the Remedy Plan entered by Judge Reese. The Remedy Plan is not, therefore, invalid simply because it was originally entered by Judge Reese before he withdrew from the case.

*876
B. Justiciability

The State parties, as well as the Pinto intervenors, contend that this action was not sufficiently adversarial to render the action justiciable. The essence of this argument is that from the time Governor Guy Hunt was removed from office as a result of a felony conviction — to be replaced by operation of law by Governor Jim Folsom — until Governor Fob James and Attorney General Jeff Sessions succeeded Governor Folsom and Attorney General James Evans as a result of the 1994 election, the action included no parties who truly represented opposing interests. These contentions are based, for the most part, on the fact that the State parties’ predecessors alternately assumed the roles of plaintiffs and defendants throughout this litigation.
The sequence of these realignments was discussed in Pinto v. Alabama Coalition for Equity, 662 So.2d 894 (Ala.1995). The original defendants in the action were “Governor Guy Hunt, State Director of Finance Robin Swift, Lieutenant Governor James Folsom, Speaker of the House of Representatives James Clark, State Superintendent of Education Wayne Teague, and the members of the Alabama State Board of Education [‘SBOE’].” Id. at 895. However, Speaker Clark, Lieutenant Governor Folsom, Superintendent Teague, and all members of the SBOE were subsequently “realigned] as plaintiffs, indicating that they agreed with [the] plaintiffs’ claims.” Id. (Emphasis added.) After Governor Hunt was succeeded by Lieutenant Governor Folsom, another realignment occurred. Speaker Clark, Superintendent Teague, and members of the SBOE were “realigned as defendants in their official capacities.” Id. at 897 (emphasis added). On June 9, 1993, Governor Folsom — who had already become a defendant by substitution — was formally realigned as such. That same day, the “parties jointly moved the trial court to certify the liability phase order as a final judgment.” Id. That judgment was not appealed.
It is contended that the multiple realignments of the state officials, their failure to appeal the Liability Phase, and their submission to the circuit court of the Remedy Plan, id. — the essence of which was ultimately adopted — identifies this action as, in the words of the Pinto intervenors in their principal brief in Pinto, “a sweetheart suit.” Brief of Pinto Appellants, at 43 (1931030 and 1931031). In other words, it is insisted, from the time Governor Hunt was removed from office until the substitution of the current Governor — Governor James — as a party defendant, this action lacked any party with an interest sufficiently adverse to confer subject-matter jurisdiction. See Brief and Argument of [State] Appellants, at 30 (1950240 and 1950241).
To be sure, “the circuit courts of this state do not have jurisdiction to issue advisory opinions when there is no case or controversy presented.” Alabama Nursing Home Ass’n v. Alabama State Health Planning Agency, 554 So.2d 1032, 1033 (Ala.Civ.App.1989). “A ‘justiciable controversy’ is a controversy in which a claim of right is asserted against one who has an interest in contesting it.” Thompson v. Hartford Accident & Indem. Co., 460 So.2d 1264, 1266 (Ala.1984).
These rules, however, primarily ensure that resort to the judiciary will not be made for “advisory opinions,” based on “hypothetical facts which are not certain to occur.” Southern Methodist Univ. v. Times Herald Printing Co., 729 S.W.2d 129, 131 (Tex.App.1987). They also ensure that courts will not “render legal opinions in ... situations [that] do not fulfill the judicial function of finally settling disputes.” Id. Additionally, they ensure that the issues and facts in the dispute will be fully and fairly presented to the court.
In a more traditional litigation context, we might find the scenario of which the State parties and Pinto intervenors complain convincing. However, this case is sui gener-is in Alabama jurisprudence. It has involved elected representatives of both the executive branch and the legislative branch of government, including (1) the Governor, (2) the state finance director, (3) the speaker of the house of representatives, (4) the president pro tempore of the senate, and (5) the SBOE.
*877 By virtue of their offices, each official represented interests that were, in many contexts, inherently adverse to those of the others. We are presented with no evidence, or, even allegations, that these officers, or any one of them, breached the public trust vested in their respective offices. Indeed, it cannot be supposed that either the speaker of the house or the president pro tempore of the senate would collude in a scheme that would ultimately require legislation misallocating state funds or that would otherwise waste the resources of this state, unless they were, in fact, engaged in such a breach. The same observations apply with equal force to the state finance director, who has remained a party defendant throughout this action. Similar observations could be made as to the Governor and the SBOE. Suffice it to say, however, that the presence of officers of both the executive branch and the legislative branch of government tended to confer upon this action an institutionalized adversity, thus minimizing the potential for collusion. Thus, the fact that the present State parties may disagree more personally and fundamentally with some aspects of this case than did their predecessors does not deprive the court of jurisdiction.
Moreover, this case contravenes in no sense the rationale underlying the rules of justiciability discussed above. The dispute does not require the court to apply legal principles to “hypothetical facts which are not certain to occur.” Southern Methodist Univ., 729 S.W.2d at 131. On the contrary, the trial court, in its Liability Phase, made extensive findings of fact and statistics, expressing in the starkest of terms the conditions then prevailing in Alabama’s public schools. See Opinion of the Justices No. 338, 624 So.2d 107, 124-44 (Ala.1993). Also, this action has, from its inception, been so postured that the judgments entered would bind all the parties necessary finally to settle this dispute. Indeed, it is precisely this aspect of the case that the State parties challenge most vigorously.
But there are yet more cogent reasons why this action does not fail for lack of adversity. First, throughout the trial of the Liability Phase, former Governor Guy Hunt was, at all times, a party defendant, and he presented an aggressive defense. It cannot be, and, in fact, is not, contended that this action lacked adversity as long as Governor Hunt was involved. Also, the decision not to appeal the Liability Phase, although curious, Pinto v. Alabama Coalition for Equity, 662 So.2d 894, 902 (Ala.1995) (Houston, J., concurring specially), had already been made by Governor Hunt before he left office. “Hunt: No appeal of school ruling,” Montgomery Advertiser, April 6, 1993, at 1A, included in Brief of Harper, ACE, ADAP, and John Doe Appellees (1950240 and 1950241) App. A. Instead, Governor Hunt promised to appoint— with the aid of Speaker Clark and then Lieutenant Governor Jim Folsom — a “task force to address the judge’s order to overhaul the education system.” Id. On October 1, 1993, the proposed Remedy Plan was submitted by, among others, Governor Folsom and Speaker Clark. Pinto, 662 So.2d at 897. In no manner that is apparent to us did the action proceed differently between the time Governor Hunt left office and the time the remedy proposal was submitted than it would have proceeded if Governor Hunt had continued in office. Thus, we fail to see how the court was deprived of jurisdiction because of insufficient adversity during this period.
On November 16, 1993, before the Remedy Plan was approved, “Walter Anderton and others purporting to represent ‘taxpayers and citizens’ of Alabama” (“Anderton interve-nors”), moved to intervene in the action. Pinto, 662 So.2d at 897. Within a month, the Pinto intervenors formally sought to join the action. In Pinto, of course, we held that the Pinto and Anderton intervenors were “entitled to intervene in the remedy phase of this unique litigation, as a matter of right, pursuant to Rule 24(a), [Ala. R. Civ. P.].” 662 So.2d at 900 (emphasis in original). Concurrently, we pointed out that “the [Remedy Phase] order entered on December 3, 1993, did not constitute a final judgment.” Id. at 898.
In the interim between December 3, 1993, and October 6, 1995, this action included not only the present State parties, but also the Pinto and Anderton intervenors. Thus, although we conclude that this action suffered *878 no infirmity through an absence of adversity, any infirmity allegedly attaching after Governor Hunt left the case was assuredly cured by the participation of the present State parties and the intervenors. See City of Springfield v. Washington Public Power Supply, 752 F.2d 1423, 1427 (9th Cir.1985) (“any doubt” as to the existence of a justicia-ble controversy at the outset of the action was dispelled by the intervention of a party taking an adversarial position), cert. denied sub nom. DeFazio v. City of Springfield, 474 U.S. 1055, 106 S.Ct. 792, 88 L.Ed.2d 770 (1986); Associated General Contractors of America v. Laborers Int’l Union, 476 F.2d 1388, 1402-03 (Temp.Emer.Ct.App.1973); 13 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 3530, at 319 (1984) (“a case conceived in cooperation may be saved by intervention of a genuine adversary”).

C. Separation of Powers

The State parties challenge the validity of the judgments on which both the Liability Phase and the Remedy Plan are based, arguing that they violate the separation of powers doctrine as primarily expressed in Ala. Const. 1901, §§ 42 and 43:
“[Section 42) The powers of the government of the State of Alabama shall be divided into three distinct departments, each of which shall be confided to a separate body of magistracy, to wit: Those which are legislative, to one; those which are executive, to another; and those which are judicial, to another.
“[Section 43] In the government of this state, except in the instances in this Constitution hereinafter expressly directed or permitted, the legislative department shall never exercise the executive and judicial powers, or either of them; the executive shall never exercise the legislative and judicial powers, or either of them; the judicial shall never exercise the legislative and executive powers, or either of them; to the end that it may be a government of laws and not of men.”
This action is nonjusticable, it is contended, because it involves a political question— one that is beyond the scope of the judiciary’s constitutional .role. In reality, this “political-question” argument is a composite of two separate inquiries. The first involves the power of the judiciary to review the constitutionality vel non of the school system — the Liability Phase. The second involves the power of the judiciary to impose a remedy— the Remedy Plan. In the following two subsections of this opinion, we shall address the issues implicated in each Phase.

(1) Inability Phase

On March 31, 1993, the trial court held that Alabama’s public education system violated “ ‘Ala. Const. art. I, §§ 1, 6,13, and 22 [guaranteeing Alabama citizens equal protection of the laws] and art. XIV, § 256 [guaranteeing Alabama citizens access to a “liberal system of public schools”].’” Pinto, 662 So.2d at 896. The State parties and the Pinto intervenors challenge the court’s exercise of jurisdiction in this phase of the action — this time, on political-question grounds.
Because the Liability Phase was never appealed, we are here presented with no issue as to the correctness of that holding. The only issue that we may consider is whether the trial court — in addressing the merits of this dispute — violated the separation of powers doctrine of our constitution. If it did, then it had no subject matter jurisdiction and the judgment was void. See Brown v. State, 565 So.2d 585 (Ala.1990); Ex parte Dison, 469 So.2d 662 (Ala.1984); Greco v. Thyssen Mining Constr., Inc., 500 So.2d 1143 (Ala.Civ.App.1986). We may address this issue because “[t]he lack of subject matter jurisdiction is not waivable and may be raised at any time by the suggestion of a party or by a court ex mero motu.” Id. at 1146. See also Stamps v. Jefferson County Bd. of Educ., 642 So.2d 941, 945 n. 2 (Ala.1994). Judgments entered without subject-matter jurisdiction can “be set aside at any time as void, either on direct or on collateral attack.” International Longshoremen’s Ass’n v. Davis, 470 So.2d 1215, 1217 (Ala.1985), aff'd, 476 U.S. 380, 106 S.Ct. 1904, 90 L.Ed.2d 389 (1986).
*879 This objection to the exercise of judicial review of the constitutionality of Alabama’s public school system is tenuous at best. Long before Alabama acquired statehood, judicial decisions had recognized the power — as well as the duty — of the judiciary to review, and, if necessary, nullify, acts of the legislature it deemed to be inconsistent with the fundamental law of the land. See Marbury v. Madison, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803) (“an act of the legislature, repugnant to the constitution is void” and it is the duty of the judiciary to declare it so); The Federalist No. 78 (A. Hamilton) (“The interpretation of the laws is the proper and peculiar province of the courts”); Simsbury Case, Kirby 444 (Conn.1784); Holmes v. Walton, (N.J.1780) (nullifying a legislative act reducing from 12 to 6 the number of jurors required in cases involving seizures of property allegedly being traded with English troops); see also Dr. Bonham’s Case, 77 Eng. Rep. 646 (1610) (“when an Act of Parliament is against common right and reason, ... the Common Law will control it, and adjudge such Act to be void”); A.E. Dick Howard, The Road from Runnymede: Magna Carta and Constitutionalism in America 280 (1968) (“Well before Marbury v. Madison there were instances of state judges announcing the power of courts to annul unconstitutional legislation”); see generally Corwin, The Establishment of Judicial Review, 9 Mich. L. Rev. 102 (1910).
This duty not only requires the judiciary to construe the language of legislative acts and statutory schemes, but, occasionally, requires it to interpret in light of the constitution the legal and practical effects of legislative or executive actions. The judiciary is, therefore, charged with the responsibility to adjudicate disputes involving the other branches of government, even if the conclusions it reaches conflict with the conclusions of the other branches. See United States v. Nixon, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974); Powell v. McCormack, 395 U.S. 486, 549, 89 S.Ct. 1944, 1978, 23 L.Ed.2d 491 (1969). “The alleged conflict that such an adjudication may cause cannot justify the courts’ avoiding their constitutional responsibility.” Powell, 395 U.S. at 549, 89 S.Ct. at 1978.
With respect to this particular controversy, a considerable number of state supreme courts have reviewed, the public school funding schemes of their respective states, pursuant to challenges based on state constitutional provisions.- See Note, State Constitutional Analysis of Public School Finance Reform Cases: Myth or Methodology, 45 Vand. L. Rev. 129, 130 n.6 (1992) (collecting cases); Note, To Render Them Safe: The Analysis of State Constitutional Provisions in Public School Finance Reform Litigation, 75 Va. L. Rev. 1639, 1639 n.4 (1989) (collecting cases). Several of these courts expressly addressed objections to the exercise of jurisdiction, based on political-question arguments similar to those presented here. See, e.g., Serrano v. Priest, 5 Cal.3d 584, 487 P.2d 1241, 96 Cal.Rptr. 601 (1971); McDaniel v. Thomas, 248 Ga. 632, 285 S.E.2d 156 (1981); Rose v. Council for Better Educ., Inc., 790 S.W.2d 186 (Ky.1989); Board of Educ., Levittown Union Free School Dist. v. Nyquist, 57 N.Y.2d 27, 453 N.Y.S.2d 643, 439 N.E.2d 359 (1982); appeal dismissed, 459 U.S. 1138, 103 S.Ct. 775, 74 L.Ed.2d 986 (1983); Board of Educ. of the City School Dist. of Cincinnati v. Walter, 58 Ohio St.2d 368, 390 N.E.2d 813 (1979), cert. denied, 444 U.S. 1015, 100 S.Ct. 665, 62 L.Ed.2d 644 (1980); City of Pawtucket v. Sundlun, 662 A.2d 40 (R.I.1995); Tennessee Small School Systems v. McWherter, 851 S.W.2d 139 (Tenn.1993); Edgewood Indep. School Dist. v. Kirby, 777 S.W.2d 391 (Tex.1989); Seattle School Dist. No. 1 v. State, 90 Wash.2d 476, 585 P.2d 71 (1978); State ex rel. Bd. of Educ. v. Manchin, 179 W.Va. 235, 366 S.E.2d 743 (1988); Kukor v. Grover, 148 Wis.2d 469, 436 N.W.2d 568 (1989); Washakie County School Dist. No. 1 v. Herschler, 606 P.2d 310 (Wyo.), cert. denied, 449 U.S. 824, 101 S.Ct. 86, 66 L.Ed.2d 28 (1980). In each case, however, the court rejected the argument — similar to the one made in this case — that the action involved a political question and was, consequently, non-justiciable. We hold, therefore, that the trial court did not exceed its constitutional authority in considering on the merits whether Alabama’s public education system violated provisions of the Constitution of 1901.

*880
(2) Remedy Plan

The State parties contend that the trial judge, in fashioning the Remedy Plan, “clearly and grossly usurped subject-matter jurisdiction over the establishment, administration and funding of the public school system of the State of Alabama ..., violating], thereby, the cardinal principles of separation of powers.” Brief and Argument of Appellants, at 27. They do not, however, contend that a different Remedy Plan is called for. They do not apprise us of what, if any remedy, the trial court would be authorized to order. In essence, if not in fact, they insist that the court possessed no authority to remedy the constitutional violation declared in this case. More specifically, they contend that the judiciary of this state cannot go further than did the Kentucky Supreme Court in Rose v. Council for Better Educ., Inc., 790 S.W.2d 186 (Ky.1989), which stated: “We have declared the system of common schools to be unconstitutional. It is now up to the General assembly to re-create ... a system of common schools within this state which will be in compliance with the Constitution.” Id. at 214 (emphasis added). Because the State parties challenge the Remedy Plan as void in toto, the resolution of this issues turns on whether the judiciary had the power to order a remedy in this case.
Parties on both sides of this dispute — in addition to the trial court — have relied on Rose, which declared unconstitutional the entire statutory scheme upon which Kentucky’s public education system was based. Id. That case, however, does not hold that a court has no power to order a remedy. On the contrary, the Kentucky court deferred the formulation of a remedy to the Kentucky legislature upon the express assumption that it would promptly and fully comply with the constitutional mandate, stating: “We have no doubt they will proceed with their duty." Rose, 790 S.W.2d at 214 (emphasis added).
Other courts have deferred to their legislatures, expressing in language similar to that used in Rose confidence that their legislatures would promptly act to remedy constitutional infirmities in their public educational systems. See, e.g., Seattle School Dist. No. 1 v. State, 90 Wash.2d 476, 585 P.2d 71, 104 (1978) (‘We have great faith in the Legislature and its ability to define ‘basic education’ and a basic program of education....”); Serrano v. Priest, 18 Cal.3d 728, 557 P.2d 929, 135 Cal.Rptr. 345 (1976) (“We are confident that the Legislature, aided by what we have said today ..., will be able to devise a public school financing system which achieves constitutional conformity....”), cert. denied, 432 U.S. 907, 97 S.Ct. 2951, 53 L.Ed.2d 1079 (1977). None of the cases we have found in our research, however, has held that the judiciary lacks the power to order a specific remedy if the legislature ultimately fails adequately to address the constitutional deficiency.
Particularly instructive in this regard are Washakie County School Dist. No. 1 v. Herschler, 606 P.2d 310 (Wyo.), cert. denied, 449 U.S. 824, 101 S.Ct. 86, 66 L.Ed.2d 28 (1980), and Campbell County School Dist. v. State, 907 P.2d 1238 (Wyo.1995). Herschler involved an action commenced by, among others, county school districts, seeking a judgment declaring Wyoming’s statutory school financing scheme unconstitutional. 606 P.2d at 314. The trial court dismissed the complaint and the plaintiffs appealed. Id.
The Wyoming Supreme Court reversed the judgment. In doing so, it “examined ‘the entire system from organization of school districts through tax bases and levies and distribution of foundation funds,’ ” Campbell County School Dist. 907 P.2d at 1246, and held “the Wyoming system of school financing unconstitutional in that it failfed] to afford equal protection in violation of the Wyoming Constitution.” Herschler, 606 P.2d at 315. It also remanded the action to the trial court with directions to “retain jurisdiction until a constitutional body of legislation [was] enacted,” and to “tak[e] such action as ... necessary to assure conformity.” Id. at 337. (Emphasis added.)
In 1983, the Wyoming legislature responded to Herschler by creating a “transitional” education financing system. Campbell County School Dist., 907 P.2d at 1247. This temporary measure was intended to be “succeeded by a new system designed to more accurately measure costs of education.” Id. Unfortunately, however, “[t]he legislature *881 never studied, enacted, or implemented a new ... system and the 1983 interim system became permanent.” Id.
Consequently, in 1992, a number of school districts, including one that was a plaintiff in Herschler, filed another complaint seeking a judgment declaring certain aspects of the interim funding system unconstitutional. 907 P.2d at 1244. The trial court entered a judgment declaring some components of the system constitutional and invalidating others. Id. The Wyoming Supreme Court affirmed that portion of the judgment invalidating aspects of the system, but reversed that portion of the judgment upholding some aspects. Once again, the supreme court held “Wyoming’s public school finance system [to be] unconstitutional.” Id.
The court stated: “In [Herschler ], this court, having examined the ‘entire system,’ emphasized [that] the legislature’s goal ‘is to arrive at financial parity.’ ... We had confidence the legislature would meet the challenge of fulfilling its constitutional duties to ‘provide for the establishment and maintenance of a complete and uniform system of public instruction_’” 907 P.2d at 1246 (emphasis added). It concluded that since Herschler the legislature not only had failed to create a funding system that would eliminate the inequities of the system, but, through a lack of “participat[ion] in the substantive aspects of the educational system,” had in fact impeded the efforts made by “local educators and communities.” Id. at 1255. Consequently, the court ordered the legislature “to achieve constitutional compliance” and to achieve it “not later than July 1, 1997.” Id. at 1280. Once again, the court remanded the cause to the trial court with directions to “retain jurisdiction until a constitutional body of legislation [was] enacted and in effect” and to “tak[e] such action as [should] be necessary to assure conformity” with the constitution. Id.
It has been suggested that the judiciary has the power to fashion specific remedies if action by the other branches of government is ineffective, where deference is made to the legislature with a caveat. McDuffy v. Secretary of the Exec. Office of Educ., 415 Mass. 545, 615 N.E.2d 516 (1993), for example, stated: We have concluded the current state of affairs falls short of the constitutional mandate. We shall presume at this time that the Commonwealth will fulfil its responsibility with respect to defining the specifics and the appropriate means to provide the constitutionally-required education.” 415 Mass. at 619 n.92, 615 N.E.2d at 554 n.92 (emphasis added).
Moreover, despite the American judiciary’s understandable preference for restraint in this complex area of litigation, it routinely does — in addressing the constitutionality of state statutory schemes — formulate guidelines of varying specificity within which it essentially requires the legislature to operate. Id. As stated in Abbott v. Burke, 119 N.J. 287, 388, 575 A.2d 359, 410 (1990): Judicial “power to require a thorough and efficient education is not limited to a money remedy. Cf. Southern Burlington County NAACP v. Mount Laurel Township (Mount Laurel II), 92 N.J. 158, 456 A.2d 390 (1983) (power' to require municipalities to take affirmative action to satisfy their affordable housing obligations).”
For these reasons, we reject the proposition that the separation of powers principle, which applies in every jurisdiction that has considered the constitutionality of its public education system, prohibits the judiciary of this State from fashioning a remedy for constitutional violations of the nature involved in this case. For the following reasons, however, we have considered only the trial court’s power to devise a remedy plan in general and not this Remedy Plan in particular.
First, as we have already stated, the State parties have not challenged the Remedy Plan provision by provision, preferring, instead, to challenge the trial court’s power to devise any remedy. This broad-brush approach has not afforded their opponents — or the trial court — the opportunity to address objections to specific provisions. The best approach, in litigation as complex and sensitive as this, is, as suggested by Harper in the context discussed in Part III.C., infra, “for the [State parties] to identify any particular section with which they disagree, for all parties to present evidence on that section, for the trial court to rule, and for [this Court to review *882 that ruling pursuant to the proper procedural device].” Brief of Harper, ACE, ADAP, and John Doe Appellees, at 17-18 [hereinafter Harper Brief ] (emphasis added).[3] We reiterate that this case has not come to us postured in this manner.
Second, and even more fundamentally, it is the legislature that bears the “primary responsibility” for devising a constitutionally valid public school system. McDuffy v. Secretary of the Exec. Office of Educ., 415 Mass. 545, 619 n.92, 615 N.E.2d 516, 554 n.92 (1993) (quoting Edgewood Indep. School Dist. v. Kirby, 111 S.W.2d 391, 399 (Tex.1989)) (emphasis added). Although the judiciary is not without the power to enforce judgments designed to remedy constitutional defects in the educational system, the judiciary should exercise this power only in the event the legislature fails or refuses to take appropriate action.
Moreover, the judiciary should not presume at the outset of litigation of this nature that legislative and executive officials will be derelict in their duties. Indeed, it must assume the contrary. The best approach for the judiciary, having invalidated the present public education system, would be to stay further action in the case — but retaining jurisdiction — for a reasonable time, thus affording the legislative and executive officials the first opportunity to devise a constitutional public education system. In other words, the judiciary should — -upon its first encounter with this species of litigation — forgo specific remedial action until the coordinate branches of government have had a reasonable opportunity to discharge their constitutional responsibilities consistent with its holding of liability. Ultimately, of course, the action, or inaction, of those branches “in this subject area, or in any area, is ... subject to the scrutiny of the” judiciary. Rose, 790 S.W.2d at 214 (emphasis added). We reiterate that the power inherent in this judicial scrutiny also includes the power to fashion a remedy and to require compliance therewith.
We hasten to add that we do not disapprove of the Remedy Plan challenged in this case, only of the timing of its attempted implementation. The implementation thereof was premature. Consequently, we vacate the October 6, 1995, judgment of the trial court to the extent that it concerns the implementation of the Remedy Plan. This cause is remanded with directions to stay the action — while retaining jurisdiction — for one year from the date of this Court’s certificate of judgment. If, at the end of that time, the coordinate branches of government have not formulated an educational system that complies with the Liability Phase, the trial court may entér an order implementing a remedy. This Court is prepared to consider any such remedy should it be called upon to do so under conditions consistent with those explained above.
We hold, therefore, not that the trial court lacked the power to implement the Remedy Plan, but that it abused its discretion in attempting to do so before providing the coordinate branches of government the opportunity to act unilaterally. The question is not one of power, but of expedience. We are certain that officials of both coordinate branches of government will hasten to discharge their duties to fashion a remedy consistent with the judgment in the Liability Phase.

II. Cases 195024,0 and 1950241— The State Parties’ Appeal

The issues raised in these appeals were thoroughly discussed and resolved in Part I of this opinion and will not be addressed again here. Therefore, in accordance with Part I, the judgment from which these appeals were taken is affirmed in part, vacated in part, and remanded with the directions set forth in Part I.C.(2), supra.

III. Cases 1950408 and 1950409-Intervention

The Pinto intervenors contend that both the Liability Phase and the Remedy Plan *883 must be vacated for reasons in addition to those we have addressed previously in this opinion. First, they contend that in Pinto v. Alabama Coalition for Equity, 662 So.2d 894 (Ala.1995), this Court granted the classes they seek to represent[4] “appellate class certification.” Brief of Pinto Appellants, at 16 (emphasis added). This certification, they argue, necessarily renders the “Harper class,”[5] which was certified before the entry of the Liability Phase, invalid as being over-broad or insufficiently definite. The essence of this argument is that the invalidation of the Harper class retroactively invalidates the Liability Phase. In a second argument, which is similar to the first, they argue that because Pinto ultimately allowed them to intervene, the Remedy Plan, which was pending when they first sought to intervene, must be vacated.
Before discussing the merits of these arguments, we note that the Pinto intervenors, unlike the State parties, have not sought permission to appeal the interlocutory Remedy Order. We will, however, suspend the Rules of Appellate Procedure as to any procedural or technical impediment to the review of the issues they present, pursuant to Ala. R. App. P. 2(b), which provides: “In the interest of expediting decision, or for other good cause shown, an appellate court may suspend the requirements or provisions of any of these rules in a particular case ... on its own motion and may order proceedings in accordance with its direction....” We construe the Rules of Appellate Procedure in a manner “to assure the just, speedy and inexpensive determination of every appellate proceeding.” Rule 2(b) committee comments.
The issues presented by the Pinto interve-nors are inextricably linked with those presented by the State parties in their Rule 5 petition, which we have granted. Neither the interests of justice nor judicial economy would be promoted by dismissing the appeals of the Pinto intervenors, who may have miscalculated the efficacy of the trial court’s Rule 54(b) certification. We will, therefore, proceed to address their arguments.

A. Certification and Validity of Liability Phase

The Pinto intervenors argue that this Court certified their three putative classes ex mero motu. Consistent with this view, they proposed to Judge Greenhaw that Pinto had rendered unnecessary a motion for class certification, and, consequently, that no findings or actions by the trial court were required. Harper Brief, at 38. The trial court rejected this argument and ordered the Pinto interve-nors to file a motion for class certification. Id.
On October 3, 1995, the Pinto intervenors filed a motion for certification of the three classes for whom they sought intervention in Pinto. In their motion, they reiterated their argument that trial-court certification was unnecessary, and, moreover, “move[d] ... to reopen the class certification of the Harper class.” The Harper class responded with a motion opposing certification of the putative Pinto classes.
Harper’s motion challenged the Pinto in-tervenors’ construction of this Court’s holding in Pinto, stating:
“No order exists certifying the Pinto classfes] as required by Rule 23(c)(1). Indeed, prior to the Pinto decision, no motion was ever filed in either this court or the Supreme Court seeking certification. The Pinto appellants in the Supreme Court did not ask the court to certify their classes. Indeed, they expressly asked the Supreme Court to leave the question up to this court on remand. Even if under Rule 23 a class could be certified by implication — and it cannot — it would be inappropriate for this court to conclude that the Alabama Supreme Court impliedly granted appellants relief beyond the relief sought.
*884 “The precise holding of the Supreme Court is that ‘Pinto and Anderton are entitled to intervene.’ [662 So.2d at 900.] This holding does not even suggest, much less hold, that class certification is appropriate. Indeed, the Supreme Court’s decision concerns Rule 21, not rule 23....
“The Supreme Court’s opinion does contain some language about the desirability of hearing the views of the ‘classes’ represented by Pinto. However, a fair reading of the opinion reveals that the Supreme Court was simply expressing its interest in ensuring that divergent views be heard. Given that the Pinto individuals will be represented, those views will be heard.”
(Emphasis added.) The motion also opposed the certification of the putative classes on the grounds, among others, (1) that no facts were alleged or demonstrated as to the considerations of numerosity, commonality, or typicality required by Rule 23; (2) that representation by the same counsel of all three classes would result in a conflict of interest; and (3) that no showing had been made as to the resources or experience of the Pinto in-tervenors’ counsel to represent the classes adequately.
On February 6,1996, the trial court denied the Pinto intervenors’ motion for certification, in an order stating in part:
“A motion to withdraw was filed on behalf of primary counsel for the Pinto Plaintiffs and co-counsel also filed a Motion to Continue regarding class certification on the ground that additional counsel needed to be retained. At the hearing the Pinto plaintiffs were given 30 days to associate new counsel, however, no further pleadings have been filed. Inasmuch as the requisites of Rule 23, A.R.C.P., Code of Alabama 1975, have not been met the Court cannot certify the classes the Pinto Plaintiffs seek to represent but will allow them to remain as individual ... plaintiffs.
“The attorney for the Anderton Plaintiffs-Intervenorfs] was not present at the hearing and has not filed a motion requesting class certification. It is without question that individual taxpayers have standing to bring an action on behalf of other taxpayers when state funds are involved and the Anderton Plaintiffs as previously stated will also be allowed to remain as individual ... plaintiffs in this matter.”
(Emphasis added.)
On February 7,1996, the Pinto intervenors moved for reconsideration of that order. Their motion stated that they had been successful in associating counsel experienced in class actions and requested “an opportunity to present evidence for class certification.” On March 11,1996, the trial court vacated its February 6, 1996, order to the extent that it denied class certification. The court reasoned that “the issue of class certification should not be considered until the matters pending on appeal [to this Court were] resolved.”
As to whether this Court “certified” the Pinto intervenors’ putative classes ex mero motu, Harper’s interpretation of Pinto is correct. That case presented no issue as to whether the- requirements of Rule 23 had been satisfied. In fact, the opinion is devoid of any reference to Rule 23. Instead, we focused solely on the abstract legal question of whether this action was of the genre of actions theoretically maintainable as class actions. We merely assumed, arguendo, of course, that the putative representatives could “establish all of the criteria set forth in Rule 23(a) and one of the criteria set forth in Rule 23(b).” Ex parte Gold Kist, Inc., 646 So.2d 1339, 1341 (Ala.1994).
Indeed, the scope and complexity of this litigation render such an approach particularly inappropriate here. The complexity and nature of this litigation raise, as Harper correctly observes, serious questions as to the experience and resources of any counsel selected to represent the Pinto intervenors’ classes, as well as issues regarding potential conflicts of interest. The trial court was correct, therefore, in requiring the Pinto in-tervenors to comply with the mandates of Rule 23(a) and (b) in that forum.
On remand of this cause, should it ultimately become necessary for the trial court to proceed further with this action, it shall then make “a determination ... as to compliance with Rule 23(a) and (b),” Rule 23(c), *885 committee comments, guided not only by this Court’s holding in Pinto, but also by the facts presented to it at that time. In other words, Pinto should not be understood as preempting all discretion in the trial court as to those matters committed to that court, First Alabama Bank v. Martin, 381 So.2d 32 (Ala.1980), such as the precise scope and contours of the classes. The outcome of this inquiry still turns on compliance with Rule 23 and is not compelled in its specific details by Pinto.

B. Invalidation of the Harper Class

One conclusion that is compelled by Pinto, however, is that the scope of the Harper and other classes must be reexamined in light of our holding in that case. The Pinto interve-nors correctly observe that at various times throughout this litigation, it has been alleged that some, or all, of the individuals in their putative classes were included in the Harper class, or some other class. Pinto, 662 So.2d at 899 n.3. Not only does “logic dictate!]” that the interests of Alabama citizens would best be served through a larger number of smaller, discrete classes than the fewer, more inclusive classes initially certified in this action, id. at 899; it also dictates that those larger classes must be narrowed to exclude those individuals who will be included in the discrete classes ultimately certified. It is clear, therefore, that the ultimate certification of the Pinto classes will necessitate the modification of the Harper class and any other classes affected.
This result does not, however, compel the conclusion that the Harper class is ipso facto invalid, or that the class action was invalid ab initio, as the Pinto intervenors argue. The proper appellate remedy for class overbreadth is an order to narrow the class rather than an order to decertify the class action. Ex parte Central Bank of the South, 675 So.2d 403 (Ala.1996) (petition for a writ of mandamus denied to the extent it sought decertification of a class action; granted to the extent it sought narrowing of the scope of a class); Ex parte Gold Kist, Inc., 646 So.2d 1339 (Ala.1994) (petition for a writ of mandamus denied to the extent it sought decertification of a class action; granted to the extent it sought narrowing of the scope of a class). Thus, we hold that the scope of the Harper class does not invalidate the Liability Phase.

C. Wrongful Exclusion and Remedy Plan

The Pinto intervenors argue that “a reversal of a denial of intervention relates back to the time of application for intervention.” Brief of Pinto Appellants, at 12. They further contend that “there should be broad participation in the development of the [Remedy] plan (including the presentation of expert testimony) in order to avoid omission or violation of rights,” and they “hope to see removed some of the Remedy plan provisions that violate the rights of unrepresented students and parents.” Id. at 16. They conclude that “[t]he circuit court’s refusal to vacate the remedy orders denied the Pinto Appellants due process of law [guaranteed] under the United States and Alabama Constitutions.” Id.
This argument is undermined by the fact that the Remedy Plan is still interlocutory in nature. See Pinto, 662 So.2d at 899. It envisions an “ongoing process,” 662 So.2d at 900, namely, the process of “converting] a system that failed to ‘offer equitable and adequate educational opportunities to the schoolchildren of the state ’ ... into a system that succeeds in doing so.” Id. at 899 (emphasis in Pinto). The implementation of such a Remedy Plan would necessarily require “perennial revision and reassessment of the progress of [that] process.” Id. (emphasis in Pinto).
That this process is “ongoing” and that it is long-term were, in fact, significant factors in our determination that the process could only benefit from the full party-participation of the Pinto intervenors. Id. at 900. We perceive no reason they cannot enjoy precisely the “broad participation” they seek “in the development of the [Remedy] plan.” Brief of Pinto Appellants, at 12. Certainly, they, like any other party, are entitled to present expert testimony as to aspects of the Plan they deem objectionable. Thus, Harper is correct when she argues:
“[T]he proper procedure in resolving the substantive objections of the Pinto interve- *886 nors is not to vacate the entire remedy order, including the portions to which all parties agree, without any evidence being heard. The proper procedure is for the Pinto intervenors to identify any particular section with which they disagree, for all parties to present evidence on that section, for the trial court to rule, and for [this Court to review that ruling pursuant to the proper procedural device]. This is also the answer to the Pinto intervenors’ procedural objections that they have not been heard. They can still be heard.”
Harper Brief, at 17-18 (emphasis added). This appeal does not involve such a challenge, that is, a challenge to any particular provision of the Remedy Plan, and we are unpersuaded by the arguments that the Remedy Plan is invalid in toto. The judgment of the trial court as it concerns the Remedy Plan is, however, vacated, and this cause is remanded with directions to stay the action — while retaining jurisdiction — for one year from the date of this Court’s certificate of judgment.
TV. Case 1950917 — Petition for the Writ of Prohibition
In this case, the State parties seek a writ of prohibition directing the trial judge to “exercise no further jurisdiction” of this litigation during the pendency of these appeals. As we noted elsewhere in this opinion, after the notices of appeal in this case were filed, the trial judge, among other things, appointed “an independent monitor ... to oversee the implementation of the Remedy Plan.” Our resolution of the substantive issues, as discussed above, obviates the need for the relief sought in this petition. The petition is, therefore, denied, subject to the conditions explained above, namely, that all proceedings in this ease are to be stayed for one year from the date of this Court’s certificate of judgment.
In summary, the petitions for permission to appeal (cases 1950030 and 1950031) are granted. In cases 1950030, 1950031, 1950240, 1950241, 1950408, and 1950409 the judgment is affirmed in part and vacated in part, and the cause is remanded with directions to stay all proceedings in the action for one year, with the court’s retaining jurisdiction to implement its Remedy Plan if necessary. The petition for the writ of prohibition (case 1950917) is denied.
1950030 — PETITION GRANTED; AFFIRMED IN PART; VACATED IN PART; AND REMANDED WITH DIRECTIONS.
1950031 — PETITION GRANTED; AFFIRMED IN PART; VACATED IN PART; AND REMANDED WITH DIRECTIONS.
1950240 — AFFIRMED IN PART; VACATED IN PART; AND REMANDED WITH DIRECTIONS.
1950241 — AFFIRMED IN PART; VACATED IN PART; AND REMANDED WITH DIRECTIONS.
1950408 — AFFIRMED IN PART; VACATED IN PART; AND REMANDED WITH DIRECTIONS.
1950409 — AFFIRMED IN PART; VACATED IN PART; AND REMANDED WITH DIRECTIONS.
1950917 — PETITION DENIED.
SHORES, KENNEDY, and INGRAM, JJ., concur.
ALMON, J., concurs specially, with opinion.
MADDOX, J., concurs in part and dissents in part, with opinion.
HOUSTON, J., concurs in the result in part and dissents in part, with opinion.
HOOPER, C. J., dissents, with opinion.
BUTTS, J., recuses.

. The effect of this action of the trial court will be discussed more fully in Part I infra.

. We have already referred to the fact that, in HXI(F), the trial court expressly “retain[ed] jurisdiction of this matter [in order to] issue such further orders as [would] be required to secure the implementation of its orders.”

. That review of specific orders implementing specific provisions might be obtained was the sense of this Court’s order denying Governor James's petition for a writ of prohibition in Ex parte James (no. 1940679), which order stated:
”[I]ssues regarding other orders may be raised on appeal in accordance with the Alabama Rules of Appellate Procedure when such orders become final.” Pinto, 662 So.2d at 898 n.2.

. In Pinto, we considered the Pinto intervenors’ arguments for intervention “on behalf of [the following] three classes of persons involved with Alabama public schools”: (1) a "Gifted-Student class,” (2) a "General-Student class,” and (3) a "Parent Class.” 662 So.2d at 898.

. The Harper class was described at the time of certification as consisting "of all children who are presently enrolled or will be enrolled in public schools in Alabama that provide less than a minimally adequate education.” 662 So.2d at 895.